# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **IN RE COLGATE-PALMOLIVE CO.**<br>**ERISA LITIGATION** | **Master File No. 07-cv-9515 (BSJ) (KNF)** |
| **THIS DOCUMENT RELATES TO:**<br>**All Actions** | |

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO
## DEFENDANT'S PARTIAL MOTION TO DISMISS

Plaintiffs, Pamela Hosie ("Hosie"), Paul Caufield ("Caufield"), Paul Abelman ("Abelman"), Valerie R. Nutter ("Nutter"), Warren Jemmott ("Jemmott"), Susan Byrd ("Byrd"), and Adriana Vazquez ("Vazquez") are participants in the Colgate-Palmolive Company Employees' Retirement Income Plan ("the Plan"). With the exception of Jemmot, who has yet to receive his pension benefits, plaintiffs received lump sum distributions of their retirement benefits that were miscalculated in two distinct ways. First, the Plan violated ERISA's anti-backloading rules. Second, the Plan failed to perform the required "whipsaw" calculation on plaintiffs' so-called "cash balances," in violation of ERISA's command that lump sum payments of a defined benefit plan be equal to no less than the actuarial equivalent of the single-life annuity they would have been entitled to at normal retirement age.

The Plan, in its current motion to dismiss, asks the Court to find the plaintiffs' claims are barred by (a) statutes of limitation and (b) employment separation contracts,

which the Plan alleges released the Plan for violations of ERISA.[1]  The Plan's motion is meritless and should be denied in its entirety.

First, contrary to the Plan's assertion, plaintiffs' claims did not "accrue" when the Plan issued its 1994 Summary Plan Description ("SPD") or when it distributed lump sum checks.  Neither of these constituted "unequivocal repudiation" of plaintiffs' right to the full value of their pension under ERISA.  An unequivocal repudiation occurs "when there has been a repudiation by the fiduciary which is clear and made known to the beneficiaries."  *Miles v. New York State Teamsters Conference Pension and Retirement Fund Employee Pension Ben. Plan*, 698 F.2d 593, 598-599 (2d Cir. 1983) (internal quotation omitted).  Where plaintiffs, as here, sue not for an outright denial of benefits but for miscalculated retirement benefits, the established rule in this Court is that the limitations period begins to run only after the claimant inquires about the Plan's calculation of benefits and the Plan informs her that it stands by its original calculation. *See Novella v. Westchester County*, 443 F.Supp.2d 540, 544-545 (S.D.N.Y. 2006) ("the claim does not begin to run until a prospective class member inquires about the calculation of his benefits, and the Plan rejects his claim that the benefits were miscalculated."), *reconsideration denied,* 2007 WL 2582171 (S.D.N.Y. Sept. 10, 2007), *adopted by* 2008 WL 1743342 (S.D.N.Y. Jan 14, 2008).  There is no evidence that occurred in this case.  Consequently, the statute of limitations cannot possibly have run on plaintiffs' claims and the Court need not determine which, if any, statutes of limitation would apply.

---

[1] The Plan separates plaintiffs into two categories for purposes of its arguments. The "statute of limitation" argument pertains only to plaintiffs Nutter, Caufield and Byrd, while the "release" argument pertains to plaintiffs Jemmott, Vazquez, and Abelman.

Second, the releases plaintiffs Jemmott, Vazquez and Abelman signed, far from barring their claims, expressly *exempt* those claims from coverage.  Additionally, the releases they executed only run in favor of Colgate-Palmolive Company ("Colgate" or "Company"), not the Plan, which is a separate and distinct juridical entity.  Even if neither of those two flaws in Plan's argument existed, ERISA specifically bars enforcement of contracts that purport to waive the type of claims asserted by plaintiffs in this matter.

For these and other reasons, the Plan's motion to dismiss should be denied.

## ARGUMENT

### A.  THE PLAN'S STATUTE OF LIMITATIONS ARGUMENTS ARE MERITLESS.[2]

While the Plan spends several pages arguing for application of either the four-year "catch-all" statute of limitations in 28 U.S.C. § 1658 or New York's six-year statute of limitation, the Court need not resolve the issue of which statute of limitation (if any) applies because the Plan has failed to satisfy the preliminary requirement of establishing that it has clearly and unequivocally repudiated plaintiffs' claims.  The Plan offers three alternative theories to support its repudiation argument:  (1) that its 1994 SPD clearly informed plaintiffs that the Plan was repudiating the anti-backloading and benefit calculation requirements under ERISA; (2) that its issuance of lump sum checks revealed its repudiation; and (3) the fact that plaintiffs plead that it would be "futile" to exhaust administrative remedies somehow shows they knew "for certain" they had claims when they received the SPD or their lump sum checks.  *See* Plan's Memorandum in Support of Its Motion to Dismiss (Doc. 45) at 17-23.  Each theory should be rejected.

---

[2] Plaintiffs as used in this section "A" refers to plaintiffs Nutter, Caufield and Byrd.

### 1. The Plan's 1994 SPD did not "unequivocally repudiate" plaintiffs' entitlement to lump sums calculated in accordance with ERISA.

The Plan's claim that its 1994 SPD "unequivocally repudiated" ERISA's requirements to abide by the 133-1/3 rule and perform a whipsaw calculation on plaintiffs' "cash balance" is meritless.  Even if the law permitted the Plan to repudiate its obligation to lawfully compute benefits (and it does not), the 1994 SPD's general description of the Plan's accrual formula could not have alerted anyone other than a pension actuary or a lawyer with ERISA expertise that benefits under the Plan at certain junctures would increase at a rate in excess of 133-1/3 of prior years' increases, much less that the formula did not comply with the law's requirements.  *See* Plan's Motion to Dismiss (Doc. 43) 1994 SPD, Ex. F at 9.9 – 9.10, 9.12.

The Plan's claim that "the SPD explicitly states that employees who take a lump sum will receive the current account balance, nothing more" and that "lump-sum payments would be equal to each participant's account balance" is an attempt to rewrite the SPD.  *See* Doc. 45 at 3, 21.  But even if the SPD read the way defendant now wishes it read, it would not have been sufficient to place participants on notice that they were being *injured* by being paid an amount equal to their notional account balance:  the Plan could have done that only by leveling with participants that it disagreed with the IRS's interpretation of the statute and believed it could calculate lump sums as if the Plan were a defined *contribution* plan rather than a defined benefit plan.

### a. If the Plan was denying plaintiffs' rights to benefits guaranteed by ERISA, it had a fiduciary duty to provide notice to plaintiffs' in a manner calculated to be understood by the average plan participant.

ERISA required the Plan administrator to provide plaintiffs a summary plan description that explained their legal rights under the Plan "in a manner calculated to be understood by the average plan participant."  29 U.S.C. § 1022(a); *Layaou v. Xerox Corp.*, 238 F.3d 205, 209-210 (2d Cir. 2001).  Among the rights the Plan was specifically required to explain are the following: "the plan's requirements respecting eligibility for participation and benefits; a description of the provisions providing for nonforfeitable pension benefits; [and] circumstances which may result in disqualification, ineligibility, or denial or loss of benefits."  29 U.S.C.A. § 1022(b); *see also* 29 C.F.R. § 2520.102-3(l).

The Plan, as a matter of law, incorporated ERISA's accrual and benefit calculation requirements.  *See, e.g., May Dept. Stores Co. v. Federal Ins. Co.*, 305 F.3d 597, 601 (7th Cir. 2002) ("The benefits sought were plan benefits; the question was how to compute them.  The answer was given by ERISA, but that is just to say that, like many other contracts, pension plans governed by ERISA contain provisions implied by law.");  S. Rep. No. 93-127, 1974 U.S.C.C.A.N. at 4839-4849 ("The fiduciary must adhere to trust principles established by the Act, and to trust terms which are consistent with the Act").  If the Plan, as intended or later implemented, violated ERISA's accrual or benefit calculation requirements, the Plan was duty-bound to disclose this fact to plaintiffs "in a manner calculated to be understood by the average plan participant."  29 U.S.C.A. § 1022.

The requirement to explain deviations from what the Plan is required to do under ERISA stems directly from trust law, which specifically requires a trustee to disclose all material facts regarding distributions that deviate from the legally enforceable trust:

> Since the trustee is in a fiduciary relation to the beneficiary, he
> should inform the beneficiary of his rights and of the material facts

5

> affecting a transaction which is a deviation from the terms of the
> trust, in so far as the trustee knows or should know these facts.  The
> consent of the beneficiary does not preclude him from holding the
> trustee liable for a deviation from the terms of the trust, unless the
> beneficiary understands that the transaction is a deviation from the
> terms of the trust and that he is entitled to require the trustee to
> administer the trust according to its terms.

RESTATEMENT (SECOND) OF TRUSTS §216, *cmt. k* (1959).

The requirement to notify beneficiaries of deviations from the legally enforceable trust is echoed in the Colgate Plan itself, as well as Department of Labor regulations that require the Plan to provide notice when it is denying or partially denying claims for benefits.  *See* 1994 SPD at 11.8; Plan § 8.6; 29 C.F.R. §§ 2560.503-1(g)(1)*,* 2560.503-1(l).  The regulations require, among other things, timely notice of an adverse determination, reasons for the adverse determination, a description of the plan's review procedure, and a statement of the right to file suit following an adverse determination on review.  *See* 29 C.F.R. §§ 2560.503-1(g)(1)*,* 2560.503-1(l).

Assuming *arguendo* that it is permissible for an ERISA plan to "repudiate" ERISA's requirements (and it is not), the Plan has the burden to identify the language in the 1994 SPD that would have informed the average plan participant that the Plan was refusing to comply with ERISA and that participants would thereby receive less than they were entitled to under ERISA.  But the Plan does no such thing.  Rather, it argues that plaintiffs should have known that the Plan violated ERISA from the SPD's description of the accrual formula and its assertion that lump sum payments would be "the total value of your PRA [Personal Retirement Account] balance." .

> ### b.  *Plaintiffs cannot fairly be presumed to have knowledge that the Plan was violating ERISA's technical accrual rules or benefit calculation requirements.*

The Plan's argument that it "unequivocally repudiated" plaintiffs' claims, either through its SPD or when it distributed lump sum checks, rests squarely on its claim that plaintiffs should be presumed to know the relevant ERISA requirements. *See* Doc. 45 at 21 n.14 (stating that the fact that plaintiffs "did not know what the law required is irrelevant to the accrual of their claims for limitations purposes."). To support this proposition, relegated to a footnote, the Plan cites one ERISA case -- *Wright v. Heyne*, 349 F.3d 321 (6th Cir. 2003). In *Wright, the trustees* of an ERISA retirement plan sued investment advisors to the plan, alleging breach of fiduciary duties in making investment decisions and receiving commissions. *Wright*, 349 F.3d at 322. The claim there, unlike here, was brought by persons fairly presumed to know ERISA's requirements -- the trustees. *Id*. at 326. The *Wright* court held constructive knowledge was sufficient to trigger the statute of limitations under 29 U.S.C. § 1113(2) under the circumstances of that case. *Id*. at 330.

The Plan does not point out that the Third Circuit, addressing a claim under the same statute *brought by plan beneficiaries*, rejected the constructive knowledge standard and held that the knowledge necessary to trigger the statute of limitations may require consultation with experts. *Gluck v. Unisys Corp*., 960 F.2d 1168, 1178 (3d Cir. 1992) ("We hold that, under 29 U.S.C. § 1113(2), 'actual knowledge of a breach or violation' requires that a plaintiff have actual knowledge of all material facts necessary to understand that some claim exists, ***which facts could include necessary opinions of experts, knowledge of a transaction's harmful consequences, or even actual harm***.") (emphasis added) (internal citations omitted). The Second Circuit follows *Gluck* and its progeny. *See, e.g., Caputo v. Pfizer, Inc*., 267 F.3d 181, 194 (2d Cir. 2001) (noting that

"when the Legislature intends to incorporate a constructive knowledge requirement into an ERISA statute of limitations, it ordinarily does so explicitly") (citing 29 U.S.C. §§ 1370(f)(2)(A), 1451(f)(2), and 1303(e)(6)(B)); *see also McConnell v. Costigan*, 2002 WL 313528, *7 (S.D.N.Y. 2002); *Chao v. Emerald Capital Management, Ltd.*, 2006 WL 2620055, *3 (W.D.N.Y. 2006); *Harris v. Finch, Pruyn & Co., Inc.*, 2008 WL 2064972, *3 (N.D.N.Y. 2008).

Consequently, the Plan's claim that plaintiffs should be presumed to know ERISA and that they, therefore, had constructive knowledge of the Plan's violations and the fact that they were injured thereby is false. To show that it "clearly repudiated" plaintiffs' claims, the Plan has the burden to show that it informed plaintiffs "of all material facts necessary to understand that an ERISA fiduciary has breached his or her duty or otherwise violated the Act," including the fact that the Plan's violations would injure them. *Caputo*, 267 F.3d at 193; *Gluck*, 960 F.2d at 1178. This it cannot do, as is clear from examining the legal and actuarial bases of their claims.

### c. *Without expert advice, the ordinary plan participant would not have been aware that the Plan's benefit accrual and calculation formulae violated ERISA.*

Plaintiffs allege two distinct violations of ERISA: (1) violation of ERISA's 133-1/3 percent "anti-backloading" rule; and (2) the Plan's failure to perform a "whipsaw" calculation on their so-called "cash balance accounts." First, ERISA's 133-1/3 percent rule prohibited the Plan from increasing the rate at which participants' benefits accrue from one year to the next by more than one-third of any earlier rate of benefit accrual under the Plan. *See* 29 U.S.C. § 1054(b)(1)(B); *accord* Internal Revenue Code ("IRC") § 411(b)(1)(B). As plaintiffs have explained at length in their complaint, the Plan violated

the 133-1/3 percent rule by improperly accelerating the Plan's "pay-based" crediting schedule and establishing no minimum "interest credit" rate. *See* Consolidated Class Action Complaint (Doc. 36) at ¶¶ 24-31, 34-45. The Plan offers no explanation as to how the average plan participant was supposed to know that the Plan's detailed provisions relating to "pay-based" and "interest rate" credits violated ERISA's "anti-backloading" rules. No such story can plausibly be told.

Second, plaintiffs claim that under 29 U.S.C. §§ 1053(e), 1055(g) and IRC § 417(e) as implemented by Treasury Regulation § 1.417(e)-l(d), their lump sum distributions failed to be "no less than the actuarial equivalent of the single-life annuity the participant would have been entitled to at normal retirement age." Consolidated Class Action Complaint (Doc. 36) at ¶¶ 32-33, 47-54. Plaintiffs claim the Plan was required to perform a "whipsaw" calculation on the hypothetical cash balance of participants' "accrued" benefits. The whipsaw calculation involves two steps: projecting the participant's hypothetical "cash balance" to normal retirement age at the plan's interest crediting rate to determine its value at normal retirement age, and then discounting the projected value of the account back to present value at a statutorily-prescribed interest rate. *See, e.g., Esden v. Bank of Boston*, 229 F.3d 154, 158, 162-166 (2d Cir. 2000); IRS Notice 96-8.

It is true that every Circuit Court to examine this issue has *now* concluded that such a whipsaw calculation is required under a cash balance plan. *See, e.g., Esden*, 229 F.3d at 158, 164-177 (2d Cir. 2000); *Berger v. Xerox Corp. Retirement Income Guarantee Plan*, 338 F.3d 755, 757-758, 761-763 (7th Cir. 2003); *Lyons v. Georgia-Pacific Corp. Salaried Employees Ret. Plan*, 221 F.3d 1235, 1237, 1251-1253 (11th Cir.

2000); *West v. AK Steel Corp*., 484 F.3d 395, 405-411 (6th Cir. 2007).  But the Plan has offered no evidence or case law to suggest that the average plan participant would have been aware or should have known of these provisions of ERISA or their implementing regulations.  Indeed, both *Esden* and *Lyons* reversed district court rulings that held payments equal to the notional account balance of a cash balance plan were perfectly fine.  *See, e.g.*, *Esden v. The Retirement Plan of First National Bank of Boston,* 182 F.R.D. 432 (D. Vt. 1988), *rev'd on other grounds,* 229 F.3d 154 (2d Cir. 2000). Moreover, as IRS Notice 96-8 itself makes clear, there is nothing inherently illegal about paying lump sums in an amount equaling that notional balance, provided the plan's crediting rate is within a recognized "safe harbor" range, which the Colgate Plan was not. *See* IRS Notice 96-8, 1996-1 C.B. 359-61, 1996 WL 17901 (Feb. 5, 1996).  *See also Fink v. Nat'l Savings and Trust Co.,* 772 F.2d 951, 957 (D.C. Cir. 1985) (holding in an ERISA fiduciary breach case that "[t]he disclosure of a transaction that is not inherently a statutory breach of fiduciary duty cannot communicate the existence of the underlying breach").

As the Supreme Court has repeatedly pointed out, ERISA is a "comprehensive and reticulated statute" and is "enormously complex and detailed."  *Mertens v. Hewitt Associates*, 508 U.S. 248, 262 (1993); *Nachman Corp. v. Pension Ben. Guaranty Corp*., 446 U.S. 359, 361 (1980); *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 447 (1999). Under ERISA, plaintiffs were supposed to be able to *trust* the Plan to understand and follow the law, to provide them the full value of their pensions, and to inform them if the Plan was not complying with the terms of the ERISA trust.  *See, e.g.,* 29 U.S.C.A. §§ 1103(b), § 1104(a); *Massachusetts Mutual Life Insurance Co. v. Russell*, 473 U.S. 134,

152-153 (1985); *Boggs v. Boggs*, 520 U.S. 833, 845 (1997); *Central Laborers' Pension Fund v. Heinz*, 541 U.S. 739, 743 (2004).

If plan participants are presumed to understand ERISA's anti-backloading and whipsaw calculation requirements, as the Plan contends, plan participants would be required to hire independent lawyers and actuaries to examine the plan's SPD and then do the same when they receive their lump sum distributions.  This would defeat Congress's purpose in imposing strict fiduciary duties on the Plan, as this and other courts have recognized.  *See DeVito v. Pension Plan of Local 819 I.B.T. Pension Fund*, 975 F.Supp. 258, 264 (S.D.N.Y. 1997) ("the Court declines to adopt a new legal standard requiring Plan participants and beneficiaries, likely unfamiliar with the intricacies of pension plan formulas and the technical requirements of ERISA, to become watchdogs over potential Plan errors and abuses"); *Romero v. Allstate Corp.*, 404 F.3d 212, 224 (3d Cir. 2005); *Ruppert v. Alliant Energy Cash Balance Pension Plan*, --- F.R.D. ----, 2009 WL 357942 *8 (W.D.Wis. 2009) (finding that in a whipsaw case such as this that "[t]he average plan participant cannot be expected to have even a working understanding about how his pension benefits were calculated or how the law requires them to be calculated."); *Paris v. Profit Sharing Plan for Emp. of Howard B. Wolf, Inc.*, 637 F.2d 357, 361 (5th Cir. 1981).

The Plan's claim that plaintiffs should be *presumed* to have known of these arcane and technical provisions of ERISA is both unsupported and contrary to ERISA's strong anti-forfeiture policy.

> ### d.  **The Plan's SPD did not supply plaintiffs with information sufficient for the average plan participant to know that the Plan was impermissibly backloaded or that the Plan would**

***fail to perform the required whipsaw calculation and that this
could result in a lower retirement benefit for them.***

*If*, as the Plan now claims, its 1994 SPD "unequivocally repudiated" its

obligations under ERISA to abide by the 133-1/3 accrual rule and to perform a whipsaw

calculation on plaintiffs' hypothetical cash balance accounts, the burden is on the Plan to

identify where and how it made this alleged disclosure "in a manner calculated to be

understood by the average plan participant."  29 U.S.C.A. § 1022.  But the Plan devotes

only a single sentence in support of its argument that it disclosed its violation of ERISA's

anti-backloading rules.  Doc. 45 at 21.  That sentence not only begs the question, it fails

to set forth the language in the SPD that allegedly informed plaintiffs that the Plan would

not comply with ERISA's requirements.  *See* Doc. 45 at 21 (stating only: "the basic

formula that Plaintiffs claim violates the 133 1/3 rule is set forth in the Plan's SPD")

(citing "1994 SPD, Motion, Ex. F at 9.9 – 9.10, 9.12; 2005 SPD, Motion, Ex. G, at 8-9").

As is evident from the technical nature of ERISA's benefit accrual requirements,

plaintiffs could not discover that the Plan violated ERISA's 133-1/3 anti-backloading rule

simply by reviewing the Plan's accrual formula.  They had to consult experts specializing

in ERISA, and it is not until they did this that they could be held to have known they had

a claim against the Plan.  *See Caputo*, 267 F.3d at 193; *Gluck*, 960 F.2d at 1178.

The Plan's further claim that "the SPD explicitly states that employees who take a

lump sum will receive the current account balance, nothing more" is simply an after the

fact attempt to *rewrite* the SPD.  *See* Doc. 45 at 3, 21.  The 1994 SPD, in fact, promised

participants that they would receive "a lump-sum payment of ***the total value of*** your PRA

[Personal Retirement Account] balance."  Doc. 43, Ex. F  (1994 SPD) at 9.12 (emphasis

added).  The Plan's current reformulation of its SPD – including its deletion of the

expression 'the total value of' and addition of explanatory expressions such as "equal to each participant's account balance" and "nothing more" – belies the Plan's claim that it "unequivocally repudiated" plaintiffs right to a whipsaw calculation.  The Plan's SPD did not state that plaintiffs' lump sums would be "equal to each participant's account balance and nothing more."  The Plan promised plaintiffs "the total value of" their account balance, which as the Plan apparently concedes, is something different from their "account balance."  The Court should soundly reject the Plan's attempt to evade its legal obligations by pretending its SPD said something it clearly did not.

Moreover, the Plan's argument that the SPD constituted "clear repudiation" ignores the fact that the SPD gave no notice that its benefit calculation formulae would *injure* the plaintiffs.  At best, the Plan described facts from which an ERISA expert might discover a violation of ERISA.  But it certainly would not have alerted average Plan participants that they were *injured*.  *See Ruppert*, 2009 WL 357942 *8.  Under the discovery rule applied to fiduciary relationships, the statute of limitations begins to run from the date on which the plaintiff discovers, or with due diligence reasonably should have discovered, that he has *suffered an injury*, not merely facts that might give rise to an injury in the future.  *See, e.g., Cantor Fitzgerald Inc. v. Lutnick*, 313 F.3d 704, 711 (2d Cir. 2002) ("In such cases, a plaintiff is entitled to rely on the statements and advice provided by the fiduciary, and if the delay in commencing an action is induced by the conduct of the defendant, the defendant cannot avail himself of the defense of the statute of limitations") (internal quotation marks, citations and alterations omitted).

The discovery rule delays triggering the statute of limitations "where plaintiff would reasonably have had difficulty discerning the fact or cause of injury at the time it

was inflicted." *Thompson v. Metropolitan Life Ins. Co.,* 149 F.Supp.2d 38, 48 (S.D.N.Y.

2001) (citing *Kronisch v. United States,* 150 F.3d 112, 121 (2d Cir. 1998)).  Under this

rule, "accrual may be postponed until the plaintiff has or with reasonable diligence should

have discovered the critical facts of both his injury and its cause."  *Id.* (citing *Corcoran v.

New York Power Auth.,* 202 F.3d 550, 544 (2d Cir. 1999)).  The test is not what the

plaintiff *could* have discovered but what the plaintiff *should* have discovered.  *Id.* at 52

n.12.[3]  Not surprisingly, given ERISA's broadly protective purposes, every Court of

Appeals to decide the question, including the Second Circuit, has held the discovery rule

applies to ERISA benefit claims.  *See Guilbert,* 480 F.3d at 149; *Carey v. IBEW Local

363 Pension Plan,* 201 F.3d 44, 48-49 (2d Cir. 1999).  The rule ensures a benefits

claimant the opportunity to learn that she has been injured and may have a possible claim

before her claim will be deemed to have accrued.   It reflects the courts' often-expressed

concerns about imposing a burden on average plan participants to investigate and

discover possible errors or abuses without fair notice, leaving the onus on the fiduciary to

clearly make known to the beneficiary that it is repudiating plaintiff's claim (or potential

---

[3] The discovery rule developed as an exception to the injury occurrence rule for cases in which "the injury [was] not of the sort that [could] readily be discovered when it occur[red]."  *Connors v. Hallmark & Sun Coal Co.,* 935 F.2d 336, 342 (D.C. Cir. 1991) (R.B. Ginsburg, J.); *see also id.* at 343 (where the injury was "likely to be a hidden injury").  As explained by Judge Posner, the injury occurrence rule can be considered analytically as a particular instance of the discovery rule (rather than the discovery rule an exception to the injury occurrence rule):  if the injury is such that it should reasonably be discovered at the time it occurs, then the plaintiff should be charged with discovery of the injury, and the limitations period should commence, at that time.  But if, on the other hand, the injury is not of the sort that can readily be discovered when it occurs, then the action will accrue, and the limitations period commence, only when the plaintiff has discovered, or with due diligence should have discovered, the injury.  *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 450 (7th Cir. 1990) ("Accrual is the date on which the statute of limitations begins to run. It is not the date on which the wrong that injures the plaintiff occurs**,** but the date - often the same*,* but sometimes later - on which the plaintiff discovers that he has been injured.") (emphasis added).]

claim) for benefits. *Devito,* 975 F. Supp. 258, 265 (S.D.N.Y. 1997) (rejecting accrual

rule in ERISA "backloading" case that "would have the undesirable effect of requiring

plan participants and beneficiaries 'likely unfamiliar with the intricacies of pension plan

formulas and the technical requirements of ERISA, to become watchdogs over potential

[p]lan errors and abuses'") (citation omitted); *Novella*, 443 F.Supp.2d at 544-45.

　　　　Contrary to the Plan's assertion, *Hirt v. Equitable Retirement Plan for Employees,*

*Managers and Agents*, 285 Fed.Appx. 802 (2d Cir. 2008) (unpublished) provides no

support for its claim that its SPD sufficiently alerted plaintiffs that they had a claim.  The

issue in *Hirt* was not whether the Plan violated ERISA by miscalculating retirement

benefits.  The question was whether the plan administrator provided sufficient notice that

a plan amendment would reduce the rate of future benefit accruals, as required under §

204(h) of ERISA.  *Id*. at 803.  The *Hirt* plaintiffs sought to avoid changes in the pension

plan on the ground that the defendant failed to provide proper notice of those changes.

The trial court rejected this argument, and in so doing devoted several pages to detailing

how the SPD explained and provided examples of how future benefits would be

calculated.  *See Hirt v. Equitable Retirement Plan For Employees, Managers and Agents*,

441 F.Supp.2d 516, 524-529, 539-540 (S.D.N.Y. 2006).  The Second Circuit affirmed,

finding that "the SPD plainly and accurately described the pension plan as it then applied

to employees, managers, and agents with various terms of service." *Hirt*, 285 Fed.Appx.

at 804.

　　　　Unlike *Hirt*, the plaintiffs here are not bringing a claim under ERISA § 204(h) to

avoid a plan's terms; they are suing to enforce the requirements of ERISA, making *Hirt*

irrelevant to the issue before this Court. *See Ruppert*, 2009 WL 357942 *5 (pointing out

that in a whipsaw case such as this, that "Defendant does not explain how *Hirt* could have any bearing on this case in light of its factual differences").  Significantly, the Second Circuit's published opinion in *Hirt*, to which the Plan makes no reference, addressed the plaintiffs' claim of benefit miscalculation *on the merits*; it did not dismiss their claims on limitations grounds, as plaintiffs ask the Court to do here.  *See Hirt v. Equitable Retirement Plan for Employees, Managers & Agents*, 533 F.3d 102 (2d Cir. 2008).

The Plan's claim that its 1994 SPD "clearly repudiated" plaintiffs' claims is entirely without merit and should be rejected.

> **2. The Plaintiffs' acceptance of their lump sum checks does not constitute a "clear repudiation" of the Plan's obligation to provide them with the total value of their pensions under ERISA.**

The Plan's claim that its distributions of lump sum checks unequivocally repudiated their obligations under ERISA is in flat contradiction to the Plan's fiduciary duty to hold and distribute those assets in trust.  The Plan did not inform plaintiffs that it was violating ERISA's requirements.  Plaintiffs cannot reasonably be expected to know by the amount of their checks – their "cash balance" - that the Plan's accrual formula and failure to perform the required whipsaw calculation violated ERISA.  Consequently, plaintiffs did not inquire about the calculation of their benefits.  As the vast majority of courts have held, no unequivocal repudiation occurs and plaintiffs' claims do not "accrue" simply by receiving a check.  *See e.g.*, *Cotter v. Eastern Conf. of Teamsters Ret. Plan*, 898 F.2d 424, 428 (4th Cir. 1990); *Kiefer v. Ceridian Corp.*, 976 F.Supp. 829, 842-843 (D.Minn. 1997).  As Judge Mukasey pointed out, payment of a participant's pension

is not the "denial" of a claim and does not amount to a "clear repudiation" of the right to a correctly calculated pension benefit. *Novella*, 443 F.Supp.2d at 544-545.

### a. To prove unequivocal repudiation of plaintiffs' miscalculation of pension benefits claim is time barred, the Plan must show that the plaintiffs inquired about the calculation and that it rejected their claim.

The Plan's argument that distributing insufficient benefits triggers the limitation period was squarely rejected by this Court in *Novella*. There, a class of pensioners challenged the calculation of their disability benefits under ERISA. *Novella*, 443 F.Supp.2d at 542. The defendant argued that some of the class members' claims were barred by the statute of limitations because their claims accrued on the date the plan calculated their benefits. *Id*. at 544. The court rejected that view, finding that a claim for miscalculated benefits does not accrue until a participant inquires about the calculation and the plan rejects her claim:

> [T]he prospective class members were not denied benefits; they received benefits that they later discovered were miscalculated with resulting underpayment. The relevant date for fixing the accrual of such a claim is when a plaintiff was put on notice that the defendant believed the method used to calculate his [pension] was correct. Thus, the claim does not begin to run until a prospective class member *inquires* about the calculation of his benefits, and the Plan *rejects* his claim that the benefits were miscalculated.

*Id*. (emphasis added).

In *Novella*, the named plaintiff questioned the calculation of his benefits and received a letter from the defendant stating that his benefits were correctly calculated. So, his claim accrued when the plan denied his claim. *Id*. In addressing other plaintiffs, however, Judge Mukasey held that the statute of limitations on their claims had not begun to run because the defendant presented no evidence that they had inquired about their

benefit calculations or that the defendant had rejected their claims of miscalculation. *Novella*, 443 F.Supp.2d at 545 ("Defendants have provided no evidence as to when or if they informed any of the 24 potential class members that their disability pension benefits were correctly calculated, and until such a repudiation of benefits was made the statute of limitations could not begin to run on their claims."); *see also Miele v. Pension Plan of New York State Teamsters Conference Pension and Retirement Fund*, 72 F.Supp.2d 88, 99-100 (E.D.N.Y. 1999); *Kiefer*, 976 F.Supp. at 842-843.

Judge Mukasey's conclusion that clear repudiation of claims for miscalculated benefits requires both an inquiry and rejection is buttressed not only by the federal discovery of injury rule, but also by ERISA's directive that vested retirement benefits are non-forfeitable and the underlying principles of trust law. *See* 29 U.S.C. §§ 1053, 1054(g)(2), 1056(d)(1); *Alessi v. Raybestos-Manhattan, Inc*., 451 U.S. 504, 510-11 (1981); *Heinz*, 541 U.S. at 750; *Boggs*, 520 U.S. at 851 (finding that ERISA's anti-alienation provisions "bespeak a pension law protective policy of special intensity: Retirement funds shall remain inviolate until retirement."); *Guidry v. Sheet Metal Workers National Pension Fund*, 493 U.S. 365, 376 (1990) (finding there is no equitable exception to the ERISA prohibition on the assignment of pension plan benefits, even when, as in that case, the pension beneficiary had embezzled more than $377,000 from the union).

Vested pension benefits do not become forfeitable due merely to *any* passage of time in failing to claim them. To retain their tax-favored status under I.R.C. § 401, 28 U.S.C. § 401, defined benefit plans, such as the Plan here, are required to include language stating that vested pension benefits will be paid regardless of delay in claiming

them.  *See* 26 U.S.C. § 411(a); 26 C.F.R. § 1.411(a)-4(b)(6) (stating that when a plan

cannot find a participant or beneficiary, the plan must provide for full payment of the

benefit due "if a claim is made by the participant or beneficiary for the forfeited

benefit"); *Cotter*, 898 F.2d at 428 (defendant's interpretation of plan document as

requiring timely application for benefits "might lead to a forfeiture of vested rights to

retirement benefits where, as here, a participant does not immediately file a claim.  Such

a forfeiture plainly violates 29 U.S.C. § 1053(a)"); *Estate of Baird v. Teamsters Affiliates*

*Pension Plan*, 317 F.Supp.2d 588, 597 (W.D.Pa. 2004) (finding a proposed requirement

that participant submit timely application to be eligible for benefits "troubling because it

conflicts with ERISA's statutorily-prescribed policy against forfeiture of vested

retirement benefits.").

　　　Moreover, under the common law of trusts, to which the Supreme Court has

repeatedly directed courts to turn when interpreting ERISA, there is no statute of

limitations for claims brought by beneficiaries to enforce their right to trust assets.[4]  *See*

RESTATEMENT (SECOND) OF TRUSTS § 219 (1959) ("The beneficiary is not barred merely

by lapse of time from enforcing the trust"); *id.*, *cmt. g* ("he does not lose his interest in

_____

　　　　　[4]  While courts have regularly applied state statutes of limitation for breach of
contract claims to ERISA claims for miscalculated benefits, and this Court is
constrained by those precedents, plaintiffs maintain that this is error.  The proper rule
is found in the law of trusts, under which there is no statute of limitations for claims
seeking trust assets.  Under the law of trusts, the trustee must show not only "clear
repudiation" but also "prejudice" under the equitable doctrine of laches.  Congress's
intention to import trust principles into ERISA and its decision to provide no statute of
limitation for miscalculation claims supports the view that laches is the proper test to
apply in these cases.  The Supreme Court has not endorsed the importation of state
statute of limitation in these circumstances and the historical development of the trend
suggests it may be the result of inadequate briefing parties.  *See e.g., Henglein v. Colt
Industries Operating Corp*., 260 F.3d 201, 208 -209 (3d Cir. 2001) (noting that
*because the parties agreed* that the court should look to the most analogous state
statute of limitation, "[w]e therefore do not discuss the doctrine of laches under the
law of trusts.").

the trust property merely because of the lapse of time, however great"); *Varity Corp. v. Howe*, 516 U.S. 489, 497 (1996); *Hughes Aircraft*, 525 U.S. at 447; *Kennedy v. Plan Adm'r for DuPont Sav. and Inv. Plan*, -- U.S. --, 2009 WL 160440, *5-6 (Jan. 26, 2009) ("Our doubts . . . point us toward authority we have drawn on before, the law of trusts that 'serves as ERISA's backdrop.'") (quoting *Beck v. Pace Int'l Union*, 551 U.S. 96, 101 (2007). Under trust law, a plaintiffs' claim against a trustee for withheld trust assets is not time-barred unless the trustee proves both that it repudiated its fiduciary duties in a manner made clear to the beneficiary *and* that the delay in filing a claim has prejudiced the trustee. *See, e.g.*, *In re Barabash*, 31 N.Y.2d 76, 80, 286 N.E.2d 268, 270 (1972) (rejecting the trustees argument that the beneficiary's claim was time-barred because "there has been [no] repudiation by the fiduciary which is clear and made known to the beneficiaries" and no prejudice was shown by the delay); *Tri-Star Pictures, Inc. v. Leisure Time Prod., B.V.*, 17 F.3d 38, 44 (2d Cir. 1994); *C.H. Venner Co. v. Central Trust Co. of New York*, 204 F. 779, 779-780 (2d Cir. 1913); BOGERT, THE LAW OF TRUSTS AND TRUSTEES §§ 948, 949 (2008) (the trustee "has the burden of proving that a long delay has occurred since the date when the cause of action was alleged to have accrued, and also that, due to changes which have come about during the period of delay, the ability of the defendant to present evidence in defense has deteriorated.").

Plaintiffs were supposed to be able to trust the Plan to give them the full value of their pensions under ERISA and to advise them if they were distributing funds in a manner that violated the ERISA trust. Here, the Plan turned over to plaintiffs every penny of what was in their "accounts" – which were never described as notional as opposed to real. It would have been unreasonable, based on what participants had been

assured, to give the matter any further thought once they confirmed that their lump sums did indeed equal their "account" balances.  Given that the Plan had consistently represented to plaintiffs that their benefit *was* their account balance they cannot be faulted for not becoming suspicious when the check they received equaled their last account statement.  *See, e.g., Central States v. Groesbeck Lumber & Supply, Inc*., 2000 WL 1670956, *3 (N.D. Ill. 2000) (denying employer summary judgment in ERISA delinquent contributions case, finding defendant "has no basis to claim that the Fund should have known of the [Groesbeck's] default prior to that date.").

They cannot reasonably be expected to know from the amount of their lump sum checks – their "cash balance" – that the Plan violated ERISA, was "repudiating" its fiduciary obligations to provide them the full value of their pensions, or that they were being injured.  As a result, their claims did not accrue when they received their lump sum payments.

       **3.**    **The fact that plaintiffs pleaded that administrative exhaustion would be futile does not imply that they "knew for certain" the Plan was violating ERISA when they received the 1994 SPD or their lump sum checks.**

The Plan's final argument in support of its claim that plaintiffs' claims accrued when they received the SPD or their lump sum checks is premised on plaintiffs' claim that administrative exhaustion would be futile.  The Plan does not dispute that exhaustion would have been futile.  Quite the contrary, the Plan embraces this position enthusiastically.  Doc. 45 at 18-20.  According to the Plan, because plaintiffs pleaded futility, they must have known *for certain* that they had claims against the Plan before they filed suit.  Doc. 45 at 19 ("by alleging futility, Nutter, Caufield and Byrd necessarily admit that they knew for 'certain' that any appeal they could have filed under the Plan

would have been denied").  Pointing to the fact that plaintiffs did not allege how or when they learned that administrative review would be futile (*Id.* at 22 n.16), the Plan claims they must necessarily have come by this knowledge from the 1994 SPD or their lump sum checks.  Doc. 45 at 19, 21-22.

The Plan string-cites several cases it claims stand for the proposition that "plaintiff's claims are time barred where plaintiff alleged futility."  Doc. 45 at 19.  But this is far from the truth.  Rather, those cases involved plaintiffs who, in pleading futility, specifically alleged facts showing they had actual knowledge of a breach long before they filed suit.  For example, in *Barnett v. Int'l Bus. Machs. Corp.*, 885 F.Supp. 581 (S.D.N.Y. 1995), the plaintiff pleaded that administrative exhaustion would be futile because five years before she filed her law suit IBM management informed her personally that they had undertaken an investigation and were denying her disability claim.  *Id.* at 587, 591.  The Plan's other cases are similar.  *See, e.g., Union Pacific R. Co. v. Beckham*, 138 F.3d 325, 332 n.4 (8th Cir. 1998) ("The claimants argue that requiring them to exhaust their administrative remedies has been futile since August 1988 . . .. Taking these allegations as true, the claimants' causes of action . . . accrued no later than August 1988 - over five years before they filed their counterclaim.").

The Plan's argument that the mere fact of pleading futility shows that plaintiffs knew that the Plan violated ERISA when it issued its 1994 SPD or when it gave plaintiffs their lump sum checks is meritless.  As is evident from a fair reading of the Complaint and an understanding of the Plan, ERISA and its implementing regulations, plaintiffs discovered the Plan violated ERISA and they were injured only after consulting attorneys specializing in ERISA, which occurred only shortly before these suits were filed.

Defendant has failed entirely to meet its burden to show plaintiffs' claims for miscalculated benefits accrued on receipt of the 1994 SPD or their lump sum checks. Consequently, plaintiffs' claims cannot possibly be time-barred under any statute of limitation.

### 4.   28 U.S.C. § 1658 does not apply to plaintiffs' claims.

The Plan argues that the Court should apply the four-year "catch-all" statute of limitations in 28 U.S.C. § 1658.  Doc. 45 at 10-16.  Section 1658 provides a default statute of limitation for causes of action arising under federal statutes enacted after December 1, 1990, and for which Congress provided no statute of limitation.  28 U.S.C. § 1658 ("Except as otherwise provided by law, a civil action *arising under* an Act of Congress enacted after the date of this section may not be commenced later than 4 years after the cause of action accrues.") (emphasis added).  The Plan argues § 1658 applies here because plaintiffs' claims are "based on" ERISA §§ 203 and 205, which were amended by the Retirement Protection Act of 1994 ("RPA"), Pub. L. No. 103-465, § 767(c)(2), 108 Stat. 4809, 5039.  *See* Doc. 45 at 13-15.  The Plan's argument fails.

> ### a.   A claim "arises under" a post-1990 amendment to a federal statute only if the amendment created the right and made it possible for the plaintiff to maintain the action.

The critical question in determining whether § 1658 applies to plaintiffs' claims is whether their claims "arise under" ERISA as it existed prior to December 1, 1990.  *See Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 373 (2004); *Mahmud v. Kaufmann*, 496 F.Supp.2d 266, 271 (S.D.N.Y. 2007) ("In determining whether § 1658 applies, courts must decide whether the plaintiff's claims arise under the amended or unamended version of [the relevant statute].") (internal quotation and brackets omitted).  This depends on

what is meant by "arising under" an Act. *Jones*, 541 U.S. at 375-383.  The Supreme

Court has answered this question in a manner inconsistent with the interpretation the Plan

asks the Court to adopt.

In *Jones*, the Supreme Court recognized the ambiguity inherent in "arising under"

when the statute under which the plaintiff brings her claim has been amended after

December 1, 1990.  *Id*. at 375-377 ("the meaning of the term 'arising under' is not so

clear").  The Court began by discussing two possible interpretations of "arising under."

First, the Court noted Chief Justice Marshall's statement that a case arises under federal

law for purposes of Article III jurisdiction whenever federal law "forms an ingredient of

the original cause."  *Id*. at 375 (quoting *Osborn v. Bank of United States*, 9 Wheat. 738,

823, 6 L.Ed. 204 (1824)).  The Court rejected this interpretation for purposes of § 1658

because both the original and amended versions of a statute can fairly be said to "form an

ingredient" of a claim whenever the underlying statute has been amended.  *Jones*, 541

U.S. at 375-376 ("Indeed, the same would appear to be true of virtually any substantive

amendment, whether or not the plaintiff could have stated a claim preamendment.").

Second, the Court considered Justice Holmes' statement that a suit "arises under

the law that creates the cause of action" if it provides a "necessary element of the

plaintiff's claim for relief."  *Id*. at 376-377 (quoting *American Well Works Co. v. Layne

& Bowler Co*., 241 U.S. 257, 260 (1916)).  But the Court found the "necessary element"

test also unhelpful; for like the first proposal, it did not determine whether a cause of

action arose under the original statute, an amendment thereto, or both.  *Id*. (quoting Judge

Friendly's statement in *T.B. Harms Co. v. Eliscu*, 339 F.2d 823, 827 (2d Cir. 1964) that

"[i]t has come to be realized that Mr. Justice Holmes' formula is more useful for inclusion than for the exclusion for which it was intended").

Finding no resolution in mere linguistic analysis, the Court examined the problems leading to the enactment of § 1658 and the purposes it was designed to accomplish. *Id.* at 377. The Court then rejected a narrow interpretation of "arising under" whereby § 1658 would apply if "the plaintiff's cause of action is based *solely* on a post-1990 statute that establishes a new cause of action *without reference to preexisting law.*" *Jones*, 541 U.S. at 380-381 (internal quotation omitted) (emphasis added). The Court said: "Nothing in the text or history of § 1658 supports an interpretation that would limit its reach to entirely new sections of the United States Code." *Id.* at 381. The *Jones* Court found: "What matters is the substantive effect of an enactment -- the creation of new rights of action and corresponding liabilities . . .." *Id.*

The Court then returned to Justice Holmes' focus on the rights *created by* an amendment, holding that "a cause of action 'aris[es] under an Act of Congress enacted' after December 1, 1990 -- and therefore is governed by § 1658's 4-year statute of limitations -- if the plaintiff's claim against the defendant was *made possible* by a post-1990 enactment." *Id.* at 382 (emphasis added). The Court held that § 1658 applies only when "a post-1990 enactment *creates a new right to maintain an action*" in the sense that the "causes of action were *made possible* by that Act." *Id.* at 382-383 (emphasis added).

### b. *Plaintiffs' claims were not created or made possible by the RPA.*

Applying this analysis to plaintiffs' claims, it is clear they do not "arise under" the RPA's amendments to ERISA. The RPA amended ERISA §§ 203 and 205 by changing the assumptions used in calculating the actuarial equivalent (*i.e.*, present value) of an

accrued benefit expressed as an annuity payable at normal retirement age.  First, the RPA increased the "applicable interest rate" used to discount the accrued benefit back to present value.  RPA, Pub. L. No. 103-465, § 767(c)(2) (defining "applicable interest rate" as the annual rate of interest on 30-year Treasury securities for the month before the date of distribution").  Before the RPA, the "applicable interest rate" was defined as the discount rate that would have been used by the Pension Benefit Guaranty Corporation for purposes of determining lump sum distributions on plan termination.  *Esden*, 229 F.3d at 164.  Second, the RPA added a requirement that the Secretary of the Treasury provide for an "applicable mortality table" to be used in converting annuities into lump sums.  RPA § 767(c)(2).  Before the RPA, ERISA required the mortality table merely to be "reasonable."  *Esden*, 229 F.3d at 165, n.14.

It is thus true that plaintiffs' claims *involve* statutes that were amended after December 1, 1990; but they "arise under" core provisions of ERISA enacted in 1974.  *See, e.g., Syed v. Hercules Inc.*, 214 F.3d 155, 159 n.3 (3rd Cir. 2000); *Laurenzano v. Blue Cross and Blue Shield of Mass., Inc. Ret. Income Trust*, 134 F.Supp.2d 189, 205 (D. Mass. 2001).  Plaintiffs do not claim that the Plan failed to apply the interest rates or mortality tables required by the RPA.  They allege that the Plan is impermissibly backloaded and that the Plan failed to perform the required whipsaw calculation on their "account balance."  Thus, it cannot plausibly be maintained that plaintiffs' claims were "created" or "made possible" by the RPA.[5]  Consequently, 28 U.S.C. § 1658 does not apply to plaintiffs' claims.

---

[5] In fact, far from creating or making plaintiffs' claims possible, the RPA actually had the effect of *reducing* plaintiffs' damages relating to the Plan's failure to perform a whipsaw calculation.

**5.   The Court should not apply the New York statute of limitation for contract claims to this ERISA claim.**

The Court should determine whether plaintiffs' claims are time-barred by appeal to the equitable principle of laches, as has previously been explained.  This requires the Plan to prove not only a clear repudiation of its obligations under the Plan and ERISA, it also requires the Plan to demonstrate that it was prejudiced by plaintiffs' delay in bringing suit after the repudiation was allegedly made clear to them.  *See In re Barabash*, 31 N.Y.2d at 80; *Tri-Star Pictures,* 17 F.3d at 44; BOGERT, THE LAW OF TRUSTS AND TRUSTEES §§ 948, 949.  But even if the Court finds that laches does not provide the proper test, it should certainly not apply New York's statute of limitations to every plaintiff's claim.

The plaintiffs and proposed class members lived and worked in several different states.  Plaintiff Caufield and the class he seeks to represent, for instance, filed their claim in Indiana, where he worked and lived, and which has a ten-year statute of limitations for contract claims.  *See* Caufield Aff. (Exhibit A); Ind. Code § 34-11-2.  He was hired to work in Colgate-Palmolive's plant in Indiana in 1977.  Caufield Aff.  He worked his entire 22-year career at the Indiana plant and had no virtually no contact with Colgate-Palmolive's corporate offices in New York.  *Id*.  He earned his pension benefits in Indiana.  *Id*.  He received his lump sum pension benefit in Indiana.  *Id*.  And, consequently, Indiana is the place of performance of the contract and his claim should be governed by Indiana law.  *See, e.g., Bostic v. Ohio River Co. (Ohio Div.) Basic Pension Plan*, 517 F.Supp. 627, 636-37 (S.D. W.Va. 1981) (under ERISA, venue is proper where the "breach occurred," and breach occurs where contract is to be performed; contract is performed where pension benefits are received, i.e., plaintiff's residence); *Cross v. Fleet*

*Reserve Ass'n Pension Plan*, 383 F.Supp.2d 852, 856 (D. Md. 2005) (same); *Palka v.*

*Theodore M. Hylwa, M.D., Inc*., 1986 WL 22380 (D. Kan. 1986) (same).

Other proposed class members lived, worked and received their pension benefits

in other states.[6]  Because the relevant circumstances for the plaintiffs' claims are all the

same (the receipt of the 1994 SPD and their lump sum checks) the issue of whether their

claims are time-barred should be judged under the same standard.  *See Jones*, 541 U.S. at

378-379.  But application of New York law to each of them, regardless of their residence,

their work location and their reasonable expectations would not be fair, especially where

the relevant statutes of limitations in those states are longer than in New York.  *See*

*Lumpkin v. Envirodyne Industries, Inc*., 933 F.2d 449, 466 (7th Cir. 1991) ("federal

policy favors the protection of pension benefits, and it would surely yield a result

anomalous with the legislative history and purpose of ERISA to nip claims for vested

pension benefits in the bud through application of the shorter statute of limitations").

Because Indiana's limitations period is longer than New York's, applying Indiana's

statute better promotes the Congressional intent of protecting vested pension benefits.

*Id.; see also Arena v. ABB Power T & D Co. Inc.*, 2003 WL 21766560 at *8-9 (S.D. Ind.

2003).

### B.  NO PLAINTIFFS OR MEMBERS OF THE PROPOSED CLASSES HAVE EXECUTED LEGALLY ENFORCEABLE RELEASES OF THEIR ERISA CLAIMS.[7]

---

[6]  Even several of the named plaintiffs lived and worked in states other than New York.  Shari Proesel is from Lake Villa, Illinois.  Pamela Hosie resides in Milfay, Pennsylvania.  Paul Abelman is from New Albany, Ohio.  Valerie Nutter is from Zanesville, Ohio.

[7]  Plaintiffs as used in this section "B" refers to plaintiffs Jemmott, Vazquez, and Abelman.

**1. Claims Brought by Plaintiffs Abelman, Vazquez, and Jemmot Were Specifically Carved-Out of the General Releases Signed By Plaintiffs.**

The Plan maintains that plaintiffs Abelman, Vazquez, and Jemmot have released it from any claims, including their present claim for amounts they are entitled to receive under ERISA.  This argument lacks any merit on its face, as the releases for each of these plaintiffs plainly carve out an exemption for the claims made by plaintiffs here:

> Notwithstanding the generality of the foregoing, nothing herein constitutes a release or waiver by you of: (i) ***any claim or right you may have*** under COBRA or ***under any qualified pension or retirement plan***; (ii) any claim or right you may have for unemployment insurance benefits; (iii) any claim or right that may arise after the execution of this Agreement; or (iv) any claim or right you may have under the Agreement.

*See* Doc. 43, Ex. 2 to Faranda Decl., Section 3(c); Ex. 3 to Faranda Decl., Section 3(c); Ex. 4 to Faranda Decl., Section 3(c) (emphasis added).

Similar language has been found not to prohibit an employee's claim under a pension benefit plan.  In *Amara v. Cigna Corporation and Cigna Pension Plan*, 534 F.Supp. 2d 288 (D. Conn. 2008), a directly analogous case, the court analyzed a release with similar language to the release in this matter.  The court noted that "[i]mportantly, the waivers included an exception for '***any claims for benefits under any retirement, savings, or other employee benefit programs.***'"  *Id.* at 314 (emphasis added).  Like the defendant here, "CIGNA contend[ed] that the exception 'only applies to claims for benefits under the Plan, not claims alleging statutory ERISA violations,' and that Plaintiffs' claims of statutory violations are barred by the release language of the waivers."  *Id.*  The Court further noted:

> the CIGNA release contains an explicit exception for claims under CIGNA's retirement programs, and the Court finds no indication

29

that either party, much less both, intended to draw the kind of fine distinctions CIGNA now argues the Court should read into the exception. ***CIGNA points to no language, either in the waivers themselves or in the SPD for the Severance Pay Plan, that suggests, let alone explicitly states, that the exception covers only claims for benefits under the terms of the Plan, and not claims under ERISA itself.*** Although CIGNA cites to three decisions in the Second Circuit that have distinguished between claims for benefits and statutory ERISA violations, none of those cases considered the distinction in the context of a release of ERISA claims.

*Id.* at 316 (emphasis added).

The release signed by plaintiffs clearly states that it shall not "constitute[] a release or waiver . . . [of] any claim or right . . . under any qualified pension or retirement plan." The language in the release purporting to release claims arising under ERISA does not change the result. In an analogous case, the court in *Nelson v. Ipalco Enterprises, Inc.,* 2005 WL 1924332 (S.D. Ind. 2005) found that a similar carve-out provision did not bar plan participants from bring claims under ERISA.

In *Nelson*, plaintiffs, in exchange for participating in a voluntary early retirement program and severance program, signed a release generally releasing their employer from claims arising, *inter alia*, from ERISA. *Id.* at *5. However, as in the instant matter, language in the release also stated that "[t]his Agreement shall not affect Employee's benefits under the Thrift Plan." *Id.* The Court found that "[n]o employee signing the agreement, which said it 'shall not affect' Thrift Plan benefits, would have expected it to release the defendants from claims for breaches of fiduciary duties impairing those same benefits." *Id.* at *6. The court aptly noted that "the benefits preserved by the terms of the agreement would have little or no value without the ability to enforce the legal rights that protect those benefits." *Id.*

Similarly in this matter, none of the plaintiffs would have expected the release to foreclose their right to bring a suit for breach of fiduciary duties – as explained further below - given the language of the release.  *See, e.g., Seman v. FMC Corp. Retirement Plan for Hourly Employees*, 334 F.3d 728, 732 (8th Cir. 2003) ("Despite the broad wording of the release, we are faced with this passage regarding Seman's retirement benefits: 'Seman's Thrift and Pension accounts will be handled in accordance with plan provisions and normal distribution schedules using the resignation date of September 18, 1997.'  We think that the best reading of this language is that with respect to his pension rights, including his right to a disability retirement benefit," plaintiff retained his right to sue); *Brieger v. Tellabs, Inc.,* 473 F.Supp.2d 878, 885 (N.D. Ill. 2007) (although release included a broad waiver of claims provision, including ERISA claims, because it separately said that it did not extend to "any vested benefits under the Tellabs Advantage Program, the Tellabs Profit Sharing and Savings Plan, and the Tellabs Retirement Plan," such provision was a carve-out that preserved plaintiffs' right to sue).  Accordingly, the individual releases that plaintiffs signed here do not prevent them from asserting their claims.

### 2. Even if Generally Enforceable, the Releases are Not Enforceable by the Plan.

The releases, drafted by Colgate, the Plan's sponsor, do not run in favor of the Plan (perhaps because they *do* carve-out pension benefit claims); the agreements only run in favor of "Colgate and each of its past and current parents, subsidiaries, affiliates and each of its and their respective past and current directors, officers, trustees, employees, representatives and agents, and each of its and their respective successors and assigns." *See* Doc 44, Ex. 2 to Faranda Decl., Section 3(a); Ex. 3 to Faranda Decl., Section 3(a);

Ex. 4 to Faranda Decl., Section 3(a).  The Plan is, as a matter of fact and as a matter of

law, not Colgate's "agent" or "affiliate" and is *not* mentioned anywhere in the releases.

 An employer and an employee benefit plan are separate and distinct entities.  For

that reason, numerous courts have held that where a release agreement releases the

employer but not the employer-sponsored employee benefit plan, the agreement does not

release the plan.  *See, e.g., Barron v. UNUM Life Ins. Co. of Am.*, 260 F.3d 310, 315-16

(4th Cir. 2001); *Hubbert v. Prudential Ins. Co. of Am.*, 105 F.3d 669, 1997 WL 8854, *3

(10th Cir. 1997) (unpublished); *Laurenzano,* 191 F.Supp.2d at 233; *Antoniou v. Thiokol

Corp. Group Long  Term Disability Plan*, 849 F.Supp. 1531, 1534 (M.D.Fla. 1994).

 Defendant may argue that the releases' reference to "affiliates" or "agents" is

ambiguous and could refer to the Plan.  But absent objective extrinsic evidence of

Colgate's intent, that ambiguity must be construed against the drafter.  *See Brieger*, 473

F.Supp.2d at 885.  Further, it is fundamental to both ERISA and the Tax Code that a plan,

especially a defined benefit pension plan, is a juridical entity separate and distinct from

the corporate sponsor obligated to fully fund it.  *See* 29 U.S.C. § 1132(d).  ERISA

provides that a plan can sue and be sued as a distinct entity and that "[a]ny money

judgment under this subchapter against an employee benefit plan shall be enforceable

only against the plan as an entity and shall not be enforceable against any other person."

29 U.S.C. § 1132(d)(1)-(2).

 The fact that the Plan is closely related to Colgate does not mean it is Colgate's

agent or affiliate.  Indeed, if it were Colgate's agent or affiliate, the Plan would not be

exempt from taxation on earnings, Colgate would not be permitted to take tax deductions

for contributions made to the Plan, and participants would immediately recognize income as they accrue additional benefits under the Plan.

Accordingly, because Colgate and the Plan are properly recognized as separate legal entities and the release agreements by their express and unambiguous terms do not release the Plan, the releases can have no impact on plaintiffs' right to bring the present action.

### 3. Even if the Releases Are Enforceable By the Plan, ERISA Prohibits Any Contract That Purports to Release Claims for Breach of Fiduciary Duty.

Assuming *arguendo* that the subject releases run in favor of the Plan, which they do not, ERISA does not permit pension plan fiduciaries (or their sponsors) to condition receipt of pension benefits (or anything else) on a release of the Plan's fiduciary duties. *See generally*, Albert Feuer, *When Are Releases Of Claims For ERISA Plan Benefits Effective?*, 38 J. MARSHALL L. Rev. 773 (Spring 2005). The Plan's attempt to relieve itself of its fiduciary duties is in direct contradiction to ERISA's purpose and should be soundly rebuked.

To protect pension beneficiaries from being short-changed, Congress made the distribution of retirement benefits, including the lump sum payments here, a fiduciary act, governed by the law of trusts. *See* 29 U.S.C. §1002(21)(A)(1); *Russell*, 473 U.S. at 152-153. Consequently, the releases some plaintiffs were required to sign, purportedly giving up their rights under ERISA and relieving the Plan of its fiduciary duties, may not be evaluated under ordinary contract principles as the Plan maintains. The plaintiffs were not at "arm's length" from the Plan when they signed the releases. To the contrary, plaintiffs were supposed to be able to rely upon and trust the Plan to protect their

retirement benefits and to inform them of their rights both under the Plan and ERISA. *See* 29 U.S.C.A. § 1104(a); H.R. Conf. Rep. No. 93-1280, 1974 U.S.C.C.A.N. at (stating that ERISA "imposes strict fiduciary obligations" on the plans "to make applicable the law of trusts [and] *to prohibit exculpatory clauses* that have often been used in this field") (emphasis added); *Meinhard v. Salmon,* 249 N.Y. 458, 464 (1928); *Varity Corp.*, 516 U.S. at 497.

Congress expressly prohibited contracts, such as those the Plan relies on here, which purport to release plan fiduciaries of their duties:

> Except as provided in section 405(b)(1) and 405(d) [which refer to liability for breaches by other fiduciaries] ***any provision in an agreement or instrument which purports to relieve a fiduciary from responsibility or liability for any responsibility under this Part [the ERISA part entitled "Fiduciary Responsibility"] shall be void as against public policy***.

29 U.S.C. § 1110(a) (emphasis added).  The Senate Report accompanying ERISA noted explicitly that releases such as the ones at issue here are "void as against public policy." S. Rep. No. 93-127, 1974 U.S.C.C.A.N. at 4869-4870 ("Exculpatory and similar clauses which purport to relieve a fiduciary from any responsibility, obligation, or duty which under the Act *are expressly prohibited and made void as against public policy*.") (emphasis added).

The conclusion that the Plan's releases are illegal and cannot be used by the Plan to defeat its liability is further buttressed by general principles of trust law.  *See* RESTATEMENT (SECOND) OF TRUSTS, §§ 216, 217, 218.  As fiduciary, the Plan has heightened disclosure requirements.  *Id.* § 216.  If these are not met, the beneficiary may void any transaction involving the trustee.  *Id*. § 216, *cmt. n.*  As part of its duties, the Plan was required to explain to beneficiaries what their legal rights are, as well as all

material facts regarding the receipt of their lump sums that deviated from the ERISA trust. *Id*. § 216, *cmt. k* ("The consent of the beneficiary does not preclude him from holding the trustee liable for a deviation from the terms of the trust, unless the beneficiary understands that the transaction is a deviation from the terms of the trust and that he is entitled to require the trustee to administer the trust according to its terms."); *In re Unisys Sav. Plan Litigation*, 74 F.3d at 446.

Moreover, releases of federal statutory rights, such as plaintiffs' rights under ERISA, are prohibited when they contravene the underlying statutory policy. *See Brooklyn Sav. Bank v. O'Neill*, 324 U.S. 697, 704-705 (1945) ("Where a private right is granted in the public interest to effectuate a legislative policy, waiver of a right so charged or colored with the public interest will not be allowed where it would thwart the legislative policy which it was designed to effectuate."). "[A]s a general matter, courts should be loath to announce equitable exceptions to legislative requirements or prohibitions that are unqualified by the statutory text." *Martorana v. Steamfitters Local Union 420 Health, Welfare & Pension Fund Bd. Of Trustees*, 404 F.3d 797, 803 (3d Cir. 2005). One of Congress's fundamental purposes in passing ERISA was to protect pension plan participants from being short-changed or swindled out of their promised, vested pension benefits. *See e.g.*, ERISA §514(a), 29 U.S.C. §1144(a); *Boggs*, 520 U.S. at 851; *Guidry*, 493 U.S. at 376; *Alessi*, 451 U.S. at 523-24; *Aetna Health Inc. v. Davila*, 542 U.S. 200 (2004).

Further, under ERISA's anti-alienation provision, because plaintiffs' claims are for "pension entitlements," they cannot be waived unless the entitlement is actually contested. 29 U.S.C. § 1056(d)(1). Here, the benefits at issue were not contested when

the releases were signed.  As Judge Posner explained in *Lynn v. CSX Transportation*, 84

F.3d 970 (7th Cir. 1996), while a release may prevent a plan participant from asserting

claims based on a settlement agreement, it may not bar claims based on pension

entitlements.  The Second Circuit recently agreed with Judge Posner's distinction

between pension entitlements and contested benefits and found that "pension entitlements

are subject to the anti-alienation provision."  *Kickham v. Kodak Ret. Income Plan*, 2009

U.S.App.LEXIS 3869, *22 (2d Cir. 2009).

    The Plan does not pretend to have advised plaintiffs of their legal rights.

Nowhere does the Plan inform lump sum recipients that the proposed deal and release

both violated the law.  Nowhere does the Plan inform plaintiffs that they were legally

entitled to a larger lump sum.  The Plan fails to show the releases were entered into

voluntarily (as opposed to being made a necessary condition to receiving their pensions).

Nothing, in short, supports the Plan's argument that it should be relieved of liability as a

result of the releases it extracted from some plaintiffs.

    The cases Defendant cites in support of its position are inapposite.  Plaintiffs

recognize that *Howell v. Motorola, Inc.*, 2005 WL 2420410 (N.D. Ill 2005) found a

release in an ERISA breach of fiduciary case to bar plaintiffs from maintaining their

claim against defendant fiduciaries.  *Howell*, however, did not involve a release where

claims for vested benefits under ERISA were specifically excluded from the release.  The

releases in the instant matter specifically excluded claims related to benefits under the

Plan.  Similarly, the release considered by the Sixth Circuit in *Halvorson v. Boy Scouts of

America*, 215 F.3d 1326 (6th Cir. 2000), an employment discrimination case, did not

include the exemption contained in the release signed by the plaintiffs here and, further,

did not involve claims against a benefit plan for pension benefits.  The release involved in

*Yablon v. Stroock & Stroock & Lavan Ret. Plan and Trust*, 2002 WL 1300256 (S.D.N.Y.

2002), *aff'd* 98 F.App'x 55 (2d Cir. 2004) also did not include the exclusion found in this

case.  The Second Circuit's decision in *Frommert v. Xerox*, 535 F.3d 111 (2d Cir. 2008)

is also clearly distinguishable from the instant matter.  In *Frommert*, the court specifically

found that the language of the release was not ambiguous as to what the employee was

relinquishing.  *Id* at 123.  That is hardly the case in this action—particularly because of

the ambiguity created by, on the one hand, the purported release of ERISA claims and, on

the other hand, the exemption for claims for relief under the pension plan.

Accordingly, the Plan's arguments based upon its purported releases, like its

statute of limitations arguments, should be rejected.  The Plan's Motion to Dismiss

should be denied in its entirety.

Dated:  March 2, 2009                              Respectfully submitted,

                                                   **/s/ Douglas R. Sprong**
                                                   KOREIN TILLERY LLC
                                                   Douglas R. Sprong (admitted pro hac vice)
                                                   505 N. Seventh St., Suite 3600
                                                   St. Louis, MO  63101
                                                   Telephone: (314) 241-4844
                                                   Facsimile: (314) 588-7036

                                                   EDGAR PAUK [EP 1039]
                                                   144 East 44th Street, Suite 600
                                                   New York, New York 10017
                                                   Telephone: (212) 983-4000
                                                   Facsimile: (212) 808-9808

                                                   GOTTESDIENER LAW FIRM, PLLC
                                                   Eli Gottesdiener [EG 0111]
                                                   498 7th Street
                                                   Brooklyn, New York 11215
                                                   Telephone: (718) 788-1500
                                                   Facsimile: (718) 788-1650

BARROWAY TOPAZ KESSLER
MELTZER & CHECK, LLP
Joseph H. Meltzer (admitted pro hac vice)
Edward W. Ciolko (admitted pro hac vice)
Joseph A. Weeden (admitted pro hac vice)
Mark K. Gyandoh (admitted pro hac vice)
280 King of Prussia Road
Radnor, Pennsylvania  19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

*Counsel for Plaintiffs and the proposed Class*