**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE COLGATE-PALMOLIVE CO.<br>ERISA LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br>ALL ACTIONS | **Master File No. 07-cv-9515** |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' UNOPPOSED MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT, CLASS CERTIFICATION AND PLAN OF ALLOCATION, AND FOR APPROVAL OF ATTORNEYS' FEES, REIMBURSEMENT OF EXPENSES AND NAMED PLAINTIFFS' CASE <u>CONTRIBUTION AWARDS</u>**

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................... 1

SUMMARY OF ARGUMENT ................................................................ 1

ARGUMENT .......................................................................................... 5

I.   IMPLEMENTATION OF NOTICE PROGRAM ............................ 5

    A.   The Notice Plan Has Been Effectively Implemented ............... 5

    B.   The Content of the Class Notice Satisfied Rule 23.................... 7

II.   THE COURT'S PRELIMINARY CERTIFICATION OF THE
    SETTLEMENT CLASSES SHOULD BE MADE FINAL.................. 8

III.   THE PROPOSED SETTLEMENT SHOULD BE APPROVED AS FAIR,
    REASONABLE, AND ADEQUATE................................................. 9

    A.   Legal Standard for Approval .................................................... 9

    B.   Procedural Fairness:  The Negotiation Process ...................... 10

    C.   Substantive Fairness:  The Nine-Part *Grinnell* Test .............. 11

        1.   Litigation through trial would be complex, costly, and long....... 11

        2.   The classes' reaction to the Settlement has been
        overwhelmingly favorable .......................................... 12

        3.   Discovery has advanced far enough to assess the
        litigation's likely outcome ......................................... 13

        4 & 5.  Plaintiffs face real risks in establishing liability and
        damages........................................................................ 14

        6.   Maintaining a class action through to final judgment is not
        certain........................................................................... 15

        7.   The fact that the Plan could withstand a greater judgment is
        not dispositive ............................................................. 16

        8 & 9.  The Settlement is in the range of reasonableness in light of
        the best possible recovery and the attendant risks of
        litigation ...................................................................... 16

            a.   The Lump Sum Class Settlement..................................... 17

b.     The Backloading Class Settlement ................................... 18

IV.     THE PROPOSED PLAN OF ALLOCATION IS FAIR, REASONABLE, AND ADEQUATE ................................................................................... 20

V.     THE REQUESTED ATTORNEYS' FEE AWARD IS REASONABLE AND FAIR .................................................................................................... 21

A.     Governing Standards ................................................................... 21

B.     The Requested Award Here is Fair, Reasonable and Justified ............... 23

1.     The Time and Labor Expended By Counsel ............................... 23

2.     The Magnitude and Complexity of the Litigation ...................... 24

3.     The Risks of the Litigation ......................................................... 25

4.     The Quality of the Representation .............................................. 27

5.     The Award Requested in Relation to the Settlement Amount ................................................................................... 29

6.     Public Policy Considerations ...................................................... 30

7.     Lodestar Cross-Check Confirms the Reasonableness of the Requested Fee ............................................................................. 31

a.     The number of hours are reasonable ............................... 32

b.     Counsel's billing rates are reasonable ............................. 32

c.     The multiplier implied is also reasonable ........................ 33

VI.     THE COURT SHOULD REIMBURSE CLASS COUNSEL FOR EXPENSES INCURRED IN CONNECTION WITH THIS LITIGATION ....... 36

VII.     THE REQUESTED NAMED PLAINTIFF CASE CONTRIBUTION AWARDS ARE FAIR AND REASONABLE ................................................. 37

CONCLUSION .................................................................................................... 39

## TABLE OF AUTHORITIES

**Page(s)**

FEDERAL CASES

*Adair v. Bristol Tech. Systems, Inc.*,
   No. 97-cv-5874, 1999 WL 1037878 (S.D.N.Y. Nov. 16, 1999)..............................................15

*In re Agent Orange Prod. Liab. Litig.*,
   818 F.2d 179 (2d Cir. 1987).....................................................................................................20

*Alford v. United Community Banks, Inc.*,
   No. 11-cv-309 (N.D. Ga. Jan. 9, 2014)....................................................................................38

*Amara v. Cigna Corp.*,
   534 F. Supp. 2d 288 (D. Conn. 2008)..................................................................................24, 25

*In re American Bank Note Holographics, Inc.*,
   127 F. Supp. 2d 418 (S.D.N.Y. 2001)......................................................................................13

*In re AMF Bowling Sec. Litig.*,
   334 F. Supp. 2d 462 (S.D.N.Y. 2004)..................................................................................29, 31

*In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*,
   No. 02-cv-5575, 2006 WL 2789862 (S.D.N.Y. Sept. 28, 2006) ..............................................26

*In re APAC Teleservices, Inc. Sec. Litig.*,
   No. 97-cv-9145, 1999 U.S. Dist. Lexis 17908 (S.D.N.Y. Dec. 10, 2001)..............................34

*Asare v. Change Group of New York, Inc.*,
   No. 12-cv-3371, 2013 WL 6144764 (S.D.N.Y. Nov. 18, 2013)...............................................14

*In re Austrian & German Bank Holocaust Litig.*,
   80 F. Supp. 2d 164 (S.D.N.Y. 2000).........................................................................................14

*In re Bankamerica Corp. Secs. Litig.*,
   228 F. Supp. 2d 1061 (E.D. Mo. 2002)....................................................................................33

*Beam v. HSBC Bank*,
   No. 02-cv-00682 (W.D.N.Y. Nov. 21, 2005) ..........................................................................30

*In re Bear Stearns Cos. ERISA Litig.*,
   MDL No. 08-1963 (S.D.N.Y. Sept. 20, 2012)..........................................................................29

*Becher v. Long Island Lighting Co.*,
   64 F. Supp. 2d 174 (E.D.N.Y. 1999) ........................................................................................30

*Bellifemine v. Sanofi-Avents, U.S., LLC*,
   No. 07-cv-2207, 2010 WL 3119374 (S.D.N.Y. Aug. 6, 2010)...............................................38

*Berger v. Xerox Corp. Ret. Income Guar. Plan*,
   No. 00-cv-584, 2004 WL 287902 (S.D. Ill. Jan. 22, 2004) ......................................................30

*Bianco v. Erkins*,
   284 B.R. 349 (S.D.N.Y. 2002)..................................................................................................33

*Blessing v. Sirius Xm Radio, Inc.*,
   507 Fed. Appx. 1 (2d Cir. 2012) ...............................................................................................11

*Board of Trustees of the AFTRA Ret. Fund v. JPMorgan Chase Bank, et al.*,
   No. 09-cv-686, 2012 WL 2064907 (S.D.N.Y. June 7, 2012) ......................................... passim

*In re Buspirone Antitrust Litig.*,
   No. 01-MD-1410 (S.D.N.Y. April 11, 2003)..........................................................................35

*Carlson v. Xerox Corp.*,
   596 F. Supp. 2d 400 (D. Conn. 2009)......................................................................................28

*Charron v. Wiener*,
   731 F.3d 241 (2d. Cir. 2013)....................................................................................................10

*In re Citigroup Pension Plan ERISA Litig.*,
   470 F. Supp. 2d 323 (S.D.N.Y. 2006), *rev'd on other grounds*, *Lonecke v. Citigroup
   Pension Plan*, 584 F.3d 457 (2d Cir. 2009) ............................................................................19

*City of Detroit v. Grinnell Corp.*,
   495 F.2d 448 (2d Cir. 1974).......................................................................................... passim

*City of Pontiac Gen. Employees' Ret. Sys. v. MBIA, Inc.*,
   637 F.3d 169 (2d Cir. 2011)......................................................................................................17

*In re CMS Energy ERISA Litig.*,
   No. 02-cv-72834, 2006 WL 2109499 (E.D. Mich. June 27, 2006) .........................................30

*Cosgrove v. Sullivan*,
   759 F. Supp. 166 (S.D.N.Y. 1991) ...........................................................................................34

*Cronas v. Willis Group Holdings, Ltd.*,
   No. 06-cv-15295, 2011 WL 6778490 (S.D.N.Y. Dec. 19, 2011) ............................................10

*In re Currency Conversion Fee Antitrust Litig.*,
   263 F.R.D. 110 (S.D.N.Y. 2009) .............................................................................................20

*In re Currency Conversion Fee Antitrust Litig.*,
   No. 04-cv-5723, 2012 WL 3878825 (S.D.N.Y. Aug. 22, 2012)..............................................37

iv

*D'Amato v. Deutsche Bank*,
  236 F.3d 78 (2d Cir. 2001).........................................................................................10, 16

*Denney v. Deutsche Bank, A.G.*,
  443 F.3d 253 (2d Cir. 2006)....................................................................................................8

*Denney v. Jenkens & Gilchrist*,
  230 F.R.D. 317 (S.D.N.Y. 2005) .........................................................................................13

*DeVito v. Pension Plan of Local 819 IB.T Pension Fund*,
  975 F. Supp. 258 (S.D.N.Y. 1997) ......................................................................................19

*Dornberger v. Metropolitan Life Ins. Co.*,
  203 F.R.D. 118 (S.D.N.Y. 2001) .........................................................................................38

*In re Elan Sec. Litig.*,
  385 F. Supp. 2d 363 (S.D.N.Y. 2005)..................................................................................22

*In re Global Crossing Sec. and ERISA Litig.*,
  225 F.R.D. 465, 460 (S.D.N.Y. 2004) ...............................................................................Page

*In re EVCI Sec. Litig.*,
  2007 WL 2230177 (S.D.N.Y. July 27, 2007) ......................................................................34

*In re Giant Interactive Group, Inc. Sec. Litig.*,
  279 F.R.D. 151 (S.D.N.Y. 2011) .........................................................................................26

*In re Global Crossing Sec. & ERISA Litig.*,
  225 F.R.D. 436 (S.D.N.Y. 2004) ...................................................................................25, 37

*In re Globalstar Sec. Litig.*,
  No. 01-cv-1748 (S.D.N.Y. Dec. 9, 2005) ............................................................................29

*Goldberger v. Integrated Resources, Inc.*,
  209 F.3d 43 (2d Cir.2000)............................................................................................. passim

*In re Herald, Primeo, and Thema Sec. Litig.*,
  No. 09-cv-289, 2011 WL 4351492 (S.D.N.Y. Sept. 15, 2011) .......................................7, 16

*Hicks v. Morgan Stanley*,
  No. 01-cv-10071, 2005 WL 2757792 (S.D.N.Y. Oct. 24, 2005)..........................................29

*In re IMAX Securities Litig.*,
  283 F.R.D. 178 (S.D.N.Y. 2012) .........................................................................................16

*In re Independent Energy Holdings PLC*,
  No. 00-cv-6689, 2003 WL 22244676 (S.D.N.Y. Sept. 29, 2003) .........................................33

*Joel A. v. Giuliani*,
   218 F.3d 132 (2d Cir. 2000)............................................................................9

*Johnson v. Brennan*,
   No. 10-cv-4712, 2011 WL 4357376 (S.D.N.Y. Sept. 16, 2011) .......................................23, 31

*Karpus v. Borelli (In re Interpublic Secs. Litig.)*,
   No. 03-cv-1194, 2004 WL 2397190 (S.D.N.Y. Oct. 26, 2004)...............................................25

*LeBlanc-Sternberg v. Fletcher*,
   143 F.3d 748 (2d Cir. 1998)...........................................................................32

*In re Lloyd's Am. Trust Fund Litig.*,
   No. 96-cv-1262, 2002 WL 31663577, at *27 (S.D.N.Y. Nov. 26, 2002)...............................34

*Luciano v. Olsten Corp.*,
   109 F.3d 111 (2d Cir. 1997)...........................................................................32

*Maley v. Del Global Techs. Corp.*,
   186 F. Supp. 2d 358 (S.D.N.Y. 2002)........................................................... passim

*In re Marsh ERISA Litig.*,
   265 F.R.D. 128 (S.D.N.Y. 2010) ................................................................36, 38

*McReynolds v. Richards-Cantave*,
   588 F.3d 790 (2d Cir. 2009)...........................................................................11

*Mehling v. New York Life Ins. Co.*,
   248 F.R.D. 455 (E.D. Pa. 2008).....................................................................30

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*,
   246 F.R.D. 156 (S.D.N.Y. 2007) ...................................................................36

*In re Merrill Lynch Tyco Research Sec. Litig.*,
   249 F.R.D. 124 (S.D.N.Y. 2008) ...............................................................25, 27

*Millsap v. McDonnell Douglas Corp.*,
   No. 94-cv-633, 2003 WL 21277124 (N.D. Okla. May 28, 2003) .........................................30

*Missouri v. Jenkins*,
   491 U.S. 274 (1989).....................................................................................32

*In re NASDAQ Market-Makers Antitrust Litig.*,
   187 F.R.D. 465 (S.D.N.Y. 1998) ...............................................................12, 34

*Newman v. Carabiner Int'l Inc*,
   No. 99-cv-2271 (S.D.N.Y. October 19, 2001).......................................................35

*In re PaineWebber Ltd. P'ships Litig.*,
    171 F.R.D. 104 (S.D.N.Y. 1997), *aff'd*, 117 F.3d 721 (2d Cir. 1997).....................................15

*In re Providian Fin. Corp.*,
    No. C-02-1001, 2003 WL 22005019 (N.D. Cal. June 30, 2003)..............................................30

*In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*,
    148 F.3d 283 (3d Cir. 1998).........................................................................................................8

*In re Prudential Sec. Inc. Ltd. P'ships. Litig.*,
    985 F. Supp. 410 (S.D.N.Y. 1997) .............................................................................................28

*In re R.H. Donnelley Corp. ERISA Litig.*,
    No. 09-cv-7571 (N.D. Ill. Nov. 14, 2012) ................................................................................39

*Reichman v. Bonsignore, Brignati & Mazzotta, P.C.*,
    818 F.2d 278 (2d Cir. 1987).......................................................................................................36

*In re RJR Nabisco Inc. Sec. Litig.*,
    No. 88-cv-7905, 1992 WL 210138 (S.D.N.Y. Aug, 24, 1992)..................................................34

*Roberts v. Texaco, Inc.*,
    979 F. Supp. 185 (S.D.N.Y. 1997) ...........................................................................................34

*In re Safety Components Int'l Inc. Sec. Litig.*,
    166 F. Supp. 2d 72 (D.N.J. 2001) .............................................................................................34

*Silberblatt v. Morgan Stanley*,
    524 F. Supp. 2d 425 (S.D.N.Y. 2007)........................................................................................20

*Sines v. Service Corp. Intern.*,
    No. 03-cv-5465, 2006 WL 1148725 (S.D.N.Y. May 1, 2006) ...................................29, 31, 35

*Spann v. AOL Time Warner, Inc.*,
    No. 02-cv-8238, 2005 WL 1330937 (S.D.N.Y. June 7, 2005) ..........................................27, 30

*In re Stock Exchanges Options Trading Antitrust Litig.*,
    No. 99-cv-0962, 2006 WL 3498590 (S.D.N.Y. Dec. 4, 2006) .................................................33

*Stoetzner v. U.S. Steel Corp.*,
    897 F.2d 115 (3d Cir. 1990).......................................................................................................13

*Strougo v. Bassini*,
    258 F.Supp.2d 254 (S.D.N.Y. 2003)..........................................................................................38

*In re Sumitomo Copper Litig.*,
    189 F.R.D. 274 (S.D.N.Y. 1999) ...............................................................................................15

*In re Sumitomo Copper Litig.*,
    74 F. Supp. 2d 393 (S.D.N.Y. 1999)...................................................................24, 34

*Taft v. Ackermans*,
    No. 02-cv-7951, 2007 WL 414493 (S.D.N.Y. Jan. 31, 2007) ....................................13, 20, 29

*Vaszlavik v. Storage Tech. Corp.*,
    No. 95-B-2525, 2000 U.S. Dist. Lexis 21140 (D. Colo. Mar. 9, 2000)..................................30

*In re Veeco Instruments Inc. Sec. Litig.*,
    No. 05-md-1695, 2007 WL 4115808 (S.D.N.Y. Nov. 7, 2007) ............................................36

*In re Visa Check/Mastermoney Antitrust Litig.*,
    297 F. Supp. 2d 503 (S.D.N.Y. 2003)...................................................................31, 34

*In re: Vitamins Antitrust Litig.*,
    No. MISC. 99-197, MDL 1285, 2001 WL 34312839 (D.D.C. July 16, 2001)......................30

*Vizcaino v. Microsoft Corp.*,
    290 F.3d 1043 (9th Cir. 2002) .............................................................................30

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*,
    396 F.3d 96 (2d Cir. 2005)................................................................................. passim

*Weinberger v. Kendrick*,
    698 F.2d 61 (2d Cir. 1982)....................................................................................7

*Wilkins v. Mason Tenders Dist. Council Pension Fund*,
    445 F.3d 572 (2d Cir. 2006)..................................................................................17

*In re Xcel Energy, Inc., Sec., Derivative & "ERISA" Litig.*,
    364 F. Supp. 2d 980 (D. Minn. 2005)......................................................................30

*Yuzary v. HSBC Bank USA, N.A.*,
    No. 12-cv-3603, 2013 WL 5492998 (S.D.N.Y. Oct. 2, 2013)....................................22, 29, 34

**RULES**

FED. R. CIV. P. 23 ...................................................................................................5

FED. R. CIV. P. 23(a)..............................................................................................8

FED. R. CIV. P. 23(b)..............................................................................................8

FED. R. CIV. P. 23(b)(1)(A)......................................................................................8

FED. R. CIV. P. 23(b)(1)(B)......................................................................................8

FED. R. CIV. P. 23(b)(2)..........................................................................................8

FED. R. CIV. P. 23(c)(2) ........................................................................................5, 7

FED. R. CIV. P. 23(e) ......................................................................................1, 4, 8, 9

FED. R. CIV. P. 23(e)(1) ...........................................................................................9

FED. R. CIV. P. 23(h) ..............................................................................................36

**REGULATIONS**

73 Fed. Reg. 34665, 2008 WL 2433424 (June 18, 2008) ...........................................19

75 Fed Reg. 64197, 2010 WL 4065377 (Oct. 19, 2010) ...........................................19

## INTRODUCTION

On October 9, 2013, Plaintiffs Pamela Richter, Paul Caufield, Paul Abelman, Valerie R. Nutter, Warren Jemmott and Adriana Vasquez ("Named Plaintiffs" or "Plaintiffs") moved the Court to grant, and on December 16, 2013, the Court did grant, preliminary approval of the proposed Settlement of this ERISA case, begun in 2007 as three separate suits, filed in three different jurisdictions, alleging that Defendant Colgate-Palmolive Company Employees' Retirement Income Plan ("the Plan"), sponsored by Colgate-Palmolive Company ("Colgate" or the "Company") miscalculated the pension benefits of several thousand Colgate Plan participants.  *See* Dkt. Nos. 129-131, 135.

Pursuant to FED. R. CIV. P. 23(e), Plaintiffs respectfully submit this memorandum of law in support of their motion for an Order:  (i) granting final approval of the Settlement of this Lawsuit for approximately $45.9 million; (ii) certifying the Settlement Classes; (iii) giving final approval to the recommended Lump Sum Plan of Allocation; and (iv) approving attorneys' fees and expenses, and Case Contribution Awards for the six Named Plaintiffs.[1]

## SUMMARY OF ARGUMENT

Under the proposed Settlement, the Plan will pay approximately $45.9 million in additional gross settlement benefits to 8,612 current and former Plan participants (or their beneficiaries) -- an average of $5,330 per person -- via two settlement funds:  (1) the $30 million Lump Sum Class Settlement Fund, for the benefit of 3,529 participants and proposed Lump Sum Class members; and (2) the approximately $15.9 Backloading Class Settlement Fund for the benefit of 6,064 participants and proposed Backloading Class members.  *See* Agreement at 4, §

---

[1] All capitalized terms not defined herein are defined in the Class Settlement Agreement ("Settlement Agreement" or "Agreement"), Dkt. No. 130-1.

(1)(E), and 9, § (1)(CC).[2]  There is a partial overlap, of 981 people, who are members of both proposed Settlement Classes.  With the exception of claims arising under the "Residual Annuity Amendment," which the Agreement expressly preserves and carves out of the Settlement, these amounts are consideration for the settlement of the Settlement Classes' claims alleging that the Plan miscalculated their pension benefits during the period July 1, 1989 to the present.

The net amount of each fund, minus court-approved attorneys' fees, court-approved expenses and court-approved Case Contribution Awards to the Named Plaintiffs, would be distributed (or credited, in the case of Backloading Class members who are current or former employees who have not yet begun to receive their benefits) according to separate plans of allocation.  The Plan of Allocation that applies to the Backloading Class Settlement Fund is a fixed term of the Agreement; the recommended Plan of Allocation that applies to the Lump Sum Class Settlement Fund that the Court preliminarily approved is subject the Court's final approval in the exercise of its informed discretion.  *See* Agreement at 9, § (1)(BB)(6).

The Backloading Class contends that the Plan's interest crediting rate, when combined with their pay credit rate, caused the Plan to fail ERISA's benefit accrual rules.  The approximately $15.9 million Backloading Class Settlement Fund represents nearly a 100% recovery of the additional benefits, (including with interest at the Plan's interest crediting rate), under Plaintiffs' theory, that the Backloading Class would have received had the Plan originally provided participants with higher pay credit rates.  *See* Declaration of Lawrence Deutsch, E.A. ("Deutsch Decl.") ¶ 2.

The Lump Sum Class contends the Plan miscalculated the lump sum form of their benefits.  The Parties have agreed to a proposed Plan of Allocation under which the Net Lump

---

[2] References to the page numbers of documents filed with the Court's ECF system are to the page numbers assigned by the ECF system and printed at the top of the pages.

Sum Settlement Benefit would be divided among Lump Sum Class members on an individualized basis, based on a calculation of the amounts Settlement Class members could recover (using specified plaintiff-favorable assumptions) if the litigation continues and Plaintiffs were successful through trial and the exhaustion of all defense appeals and the Court awarded prejudgment interest at 5% on all underpayments from the original payment date to an assumed current payment date of July 1, 2013.  *See* Agreement at 8, § (1)(BB).  The amounts those calculations yield each Lump Sum Class member would then be adjusted to account for risks regarding the potential success of the Lawsuit and, in the case of class members receiving a payment from the Plan prior to February 12, 2001, *i.e.*, more than six years before the date suit was filed, to account for the additional risk posed by the Plan's statute of limitations defense.  *Id.* at 9, § (1)(BB)(5).

If the proposed Settlement is approved, under the recommended Lump Sum Plan of Allocation it would represent a gross recovery of approximately 41% of what Lump Sum Class members who received a lump sum on or after February 12, 2001 were underpaid (including 5% prejudgment interest from the date of the original alleged underpayment to the assumed current payment date) under Plaintiffs' realistic best case damages scenario.  *See* Deutsch Decl. ¶ 3. Participants paid before February 12, 2001 would not do nearly as well -- their gross recovery would be approximately 10% of what they were underpaid under Plaintiffs' realistic best case damages scenario plus prejudgment interest, *see id.*¶ 4  -- but these Settlement Class members face a significantly higher chance of recovering nothing as a result of Defendant's statute of limitations defense.

These are very favorable results in a case where all of the proposed Settlement Classes' 8,612 members face the real risk of non-recovery or significantly reduced recovery because of

*inter alia*, the numerous affirmative defenses and litigation risks related to liability, damages, and class certification, compared to what they would receive under the proposed Settlement. Although the time for objections has not yet expired, to date there have been no objections to the Settlement.[3]  Class Counsel has received calls, emails and faxes from dozens of Settlement Class members, and thus far the reaction of the Classes to the proposed Settlement has been overwhelmingly positive.  *See* Declaration of Mark K. Gyandoh ("Gyandoh Decl.") ¶ 18; Declaration of Eli Gottesdiener ("Gottesdiener Decl.") ¶ 8.  For these reasons, the Court should find the proposed Settlement and Lump Sum Plan of Allocation are "fair, reasonable, and adequate" under FED. R. CIV. P. 23(e) and satisfy the requirements for final approval as first set forth in *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974) ("*Grinnell*"). Likewise, the Court should grant final certification of the Settlement Classes as nothing has changed in the record that would compel the Court to reach a different conclusion than it did in preliminarily certifying the Settlement Classes.  *See* Preliminary Approval Order at ¶¶ 1-3.

Additionally, the Court should approve the requested attorneys' fees, expenses, and Case Contribution Awards.  Plaintiffs respectfully submit that the 25% requested fee award of $11,475,000 is reasonable and fair to the Settlement Classes, and justified by:  (1) the substantial time and resources committed to this action; (2) the complexity and magnitude of the case; (3) the risks posed from the outset of the litigation of a possible complete non-recovery or a substantially reduced recovery for some or all of the Settlement Classes; (4) the very favorable results achieved against an opponent represented by first-rate counsel with virtually unlimited

---

[3]  Per the Preliminary Approval Order, objectors have until March 14, 2014 to file objections. Preliminary Approval Order (Dkt. No. 35) at ¶ 9.  To the extent objections are filed, Class Counsel will address them in a supplemental brief in advance of the Final Approval Hearing, which will Class Counsel will file no later than March 21, 2013.  *See* Preliminary Approval Order at ¶ 9.

litigation resources in a difficult case requiring a level of sophistication and expertise in ERISA pension matters possessed by relatively few lawyers who can also claim to possess the requisite experience with handling cases certified under FED. R. CIV. P. 23; (5) the favorable reaction (thus far) of the Settlement Classes to the requested award; (6) the fact that the requested award is within the range of those made by this Court and other courts in comparable situations, fully consistent with "'a jealous regard to the rights of those who are interested in the fund,'" *Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43, 53 (2d Cir. 2000) (citation omitted); and (7) the strong public policy in promoting private enforcement of, and compliance with, the pension laws by providing remuneration to skilled counsel that is both fair and rewarding.

The Court should also approve the requested reimbursement of litigation costs of $556,011.17 as reasonably incurred in connection with the prosecution of the Lawsuit. Finally, the Court should also approve the modest $5,000 Case Contribution Awards requested for the Named Plaintiffs as well-deserved given their service in this action and as well within the range of previous awards of this kind.

## ARGUMENT

## I.   IMPLEMENTATION OF NOTICE PROGRAM

### A.   The Notice Plan Has Been Effectively Implemented

Following entry of the Preliminary Approval Order on December 16, 2013, the Court also certified the Settlement Classes and directed that notice of the Settlement be given to the Classes. *See* Dkt. No. 135, ¶ 6.[4] Federal Rule 23 requires that notice of a proposed settlement be

---

[4] A detailed description of this Lawsuit, including the procedural history, Plaintiffs' claims, Class Counsel's investigation of the claims, the filing of the initial complaints and Consolidated Class Action Complaint (hereafter, "Complaint"), and a summary of the litigation, including Settlement negotiations and Settlement terms, was set out in great detail in Plaintiffs'

"the best notice that is practicable under the circumstances." FED. R. CIV. P. 23(c)(2).    In accordance with the Preliminary Approval Order, on January 15, 2014, A.B. Data, Ltd. ("A.B. Data"), an experienced class action claims administrator and the notice administrator here, served the Class Notice by first-class mail, postage prepaid, to the last known address of each member of the Settlement Classes who was identifiable by reasonable effort.   Using the mailing lists of physical addresses provided by the Defendant and third party services, A.B. Data initially mailed 8,604 notices on January 15, 2014.    Additionally, A.B. Data researched address information for beneficiaries where sufficient data was available.   As a result of that research, 35 additional Class Notices were mailed to potential Settlement Class members.  *See* Affidavit of Christina Peters-Stasiewicz, ("A.B. Data Affidavit") ¶ 8, attached to Gyandoh Decl. as Exhibit 1.

1,455 of these mailed Class Notices were returned to A.B. Data as undeliverable as addressed ("UAA").  *Id*., ¶ 9.   23 of those returned had forwarding addresses and were promptly re-mailed, leaving 1,432 Class Notices returned as undeliverable without forwarding addresses. *Id.*   Through a third-party locator service, A.B. Data performed additional address searches for these potential Settlement Class Members and was able to find updated addresses for 1,291 Settlement Class members.  *Id*., ¶ 10.   A.B. Data promptly re-mailed Class Notices to those updated addresses.  *Id.*   As of the date of this filing, there are only 233 potential Settlement Class members whose Class Notice was returned as undeliverable and for whom A.B. Data was unable to obtain a valid alternative address.  *Id.* ¶ 12.   Thus, the Class Notice has been successfully delivered to 99% of the Settlement Classes.

Additionally, the Class Notice, Complaint, and all Settlement-related documents were published, along with other information, on the website www.ColgateERISAsettlement.com, a

Preliminary Approval Memorandum, Dkt. No. 131, at pages 12-17, which is incorporated by reference.

website dedicated solely to this Settlement, on January 15, 2014. As of the date of this submission, the Settlement website has received 1,294 "hits." *See* A.B. Data Affidavit at ¶ 15 (also identifying the number of downloads by document). A.B. Data also maintains a toll-free number with an Interactive Voice Response ("IVR") system for Settlement Class member inquiries. Callers can listen to an overview of the litigation, request that a Class Notice be sent to them, receive information on their rights as Settlement Class members, listen to frequently asked questions and also have the option to leave a message for Class Counsel. This toll-free number has been operational since January 15, 2014. *Id.*, ¶ 13. To date, a total of 26 voicemails have been received, each of which was promptly returned. *Id.*, ¶ 14. In addition to the 26 voicemails received via the IVR system, Class Counsel also handled 9 calls directly from potential Settlement Class members. Additionally, Settlement Class members were provided an email address, info@ColgateERISAsettlement.com, where they could direct their questions and comments to Class Counsel.

The above-described notice plan readily satisfies the standard of FED. R. CIV. P. 23(c)(2) and the mandate of due process, as the combination of the direct mail and Internet website posting caused the Class Notice to reach a very high percentage of affected Plan participants and beneficiaries.

## B. The Content of the Class Notice Satisfied Rule 23

Notice to class members must "fairly appraise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings." *In re Herald, Primeo, and Thema Sec. Litig.*, No. 09-cv-289, 2011 WL 4351492, at *6 (S.D.N.Y. Sept. 15, 2011) (quoting *Weinberger* v. *Kendrick*, 698 F.2d 61, 70 (2d Cir. 1982) (citations omitted)). So long as a notice "fairly appraise[s] prospective class members of

the class action's pendency, the relevant terms of the proposed settlement, and their options in connection with th[e] case," it is sufficient, especially when class members are provided with means to examine the settlement agreement and other pleadings in the case. *Weinberger*, 698 F.2d at 70-71; *accord In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 327 (3d Cir. 1998). Here, the mailed Class Notice, in terms of both its content and manner of dissemination, satisfied the requirements of Rule 23(e) and due process.

The content of the Class Notice provided all of the required information concerning Settlement Class members' rights and obligations under the proposed Settlement. The Class Notice set forth the background of the litigation, the definition of the Settlement Classes and the key terms of the Settlement. It contained sufficient detail to permit each member of the proposed Settlement to make an informed decision about whether to support or oppose the Settlement as well as how to obtain additional information about the Settlement, whether through the website dedicated to the Settlement or by contacting Class Counsel directly via telephone or email. In addition to the terms of the Settlement, the Class Notice informed Settlement Class members that Class Counsel would seek $11,475,000 in attorneys' fees and up to $650,000 for the reimbursement of expenses. Further, the Class Notice detailed the procedures for filing objections to the Settlement, Class Counsel's fee petition and/or the request for Case Contribution Awards to the six Named Plaintiffs, and for requesting the opportunity to be heard at the final fairness hearing.

## II.   THE COURT'S PRELIMINARY CERTIFICATION OF THE SETTLEMENT CLASSES SHOULD BE MADE FINAL

The Agreement and proposed Settlement contemplate certification of the Settlement Classes pursuant to FED. R. CIV. P. 23(b)(1)(A), 23(b)(1)(B) and 23(b)(2). *See* Agreement at 10, § (1)(LL). "Before certification is proper for any purpose – settlement, litigation, or otherwise –

a court must ensure that the requirements of Rule 23(a) and (b) have been met." *Denney v. Deutsche Bank, A.G.*, 443 F.3d 253, 270 (2d Cir. 2006).   Before entering the Preliminary Approval Order, this Court examined the record and provisionally certified the two classes for settlement purposes.   Dkt. No. 135 at ¶¶ 1-2.   Plaintiffs now ask that the Court make its preliminary certification final in connection with granting final Settlement approval, and that it do likewise with respect to the appointment of undersigned counsel as Class Counsel and the appointment of the Named Plaintiffs as Class representatives.   *Id.* at ¶ 3.   The showing made in the Preliminary Approval Memorandum, Dkt. No. 131, section III at pages 24-34, including the supporting declarations, is respectfully incorporated here by reference.   Nothing has changed in the record that would compel this Court to reach a different conclusion with respect to the final, rather than preliminary, approval of the Settlement Classes, including appointment of Class Counsel and appointment of the Named Plaintiffs as Class representatives.

## III.   THE PROPOSED SETTLEMENT SHOULD BE APPROVED AS FAIR, REASONABLE, AND ADEQUATE

### A.   Legal Standard for Approval

Federal Rule 23(e) governs the settlement of class actions and requires court approval before a settlement is executed.   Adequate notice of the proposed settlement must be provided and the proposed settlement must be the subject of a fairness hearing.   FED. R. CIV. P. 23(e)(1). In addition, a court may approve a settlement that is binding on the class only if it determines that the settlement is "fair, adequate, and reasonable and not a product of collusion."   *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 116-117 (2d Cir. 2005).   The determination of the fairness of a settlement is a matter addressed to the district court's sound discretion.   *Joel A. v. Giuliani*, 218 F.3d 132, 139 (2d Cir. 2000) (citations omitted); *accord Wal-Mart Stores, Inc.*, 396 F.3d at 116-117.

The Second Circuit has set forth two tests for determining the fairness of a class action settlement.  First, "[t]he District Court determines a settlement's fairness by examining the negotiating process leading up to the settlement as well as the settlement's substantive terms." *Cronas v. Willis Group Holdings, Ltd.*, No. 06-cv-15295, 2011 WL 6778490, at *2 (S.D.N.Y. Dec. 19, 2011) (citing *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001)).  This is a test of procedural fairness.  *D'Amato*, 236 F.3d at 85.  Second, the Court must consider the following nine factors to determine substantive fairness:

> (1) the complexity, expense and likely duration of the litigation, (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed, (4) the risks of establishing liability, (5) the risks of establishing damages, (6) the risks of maintaining the class action through the trial, (7) the ability of the defendants to withstand a greater judgment, (8) the range of reasonableness of the settlement fund in light of the best possible recovery, (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Grinnell*, 495 F.2d at 463; *see also Charron v. Wiener*, 731 F.3d 241, 247 (2d. Cir. 2013).

## B.     Procedural Fairness:  The Negotiation Process

A district court reviewing a proposed settlement "must pay close attention to the negotiating process, to ensure that the settlement resulted from arm's-length negotiations and that plaintiffs' counsel . . . possessed the experience and ability, and have engaged in the discovery, necessary to effective representation of the class's interests."  *D'Amato*, 236 F.3d at 85 (internal quotation omitted).  Here, the evidence clearly establishes that the agreement reached was not the product of collusion and that the negotiating process leading up to the settlement was fair.  In 2010, after three years of hard-fought litigation and three separate mediations before a respected private mediator, the parties to this complex ERISA pension benefits cases reached an agreement in principle to settle it.  It took more than *three additional years* of complicated and difficult negotiations, the extensive involvement of the Parties'

10

actuarial consultants, and ultimately a "carve-out" of certain claims before the parties' agreement

could be memorialized to both sides' mutual satisfaction. *See* Gyandoh Decl. ¶ 6. To say the

negotiations here were arms-length is an understatement indeed. The negotiation process here,

conducted on Plaintiffs' behalves by some of the leading members of the ERISA plaintiffs class

action bar, amply satisfied the requirements for procedural fairness. *See Blessing v. Sirius Xm*

*Radio, Inc.*, 507 Fed. Appx. 1, 3 (2d Cir. 2012) ("With respect to procedural fairness, a proposed

settlement is presumed fair, reasonable, and adequate if it culminates from 'arm's-length

negotiations between experienced, capable counsel after meaningful discovery'") (quoting

*McReynolds v. Richards-Cantave*, 588 F.3d 790, 803 (2d Cir. 2009)).

## C.   Substantive Fairness:  The Nine-Part *Grinnell* Test

Plaintiffs submit the proposed Settlement is substantively fair, reasonable, and adequate,

and should be approved.

### 1.   Litigation through trial would be complex, costly, and long.

The first factor articulated by the Second Circuit for assessing the adequacy of class

action settlements is "the complexity, expense and likely duration of the litigation." *Grinnell*,

495 F.2d at 463. This factor weighs heavily in favor of Settlement.

This case has been litigated for more than seven years. It involves the correctness and/or

legal adequacy of calculations and payments of hundreds of millions of dollars of pension

benefits over a 25 year period to many thousands of participants. Liability, damages, class

certification and the timeliness of plaintiffs' claims are all still in dispute. Some of the legal

questions regarding liability and/or damages could be classified as novel or at least unresolved

and resolution of these issues on the facts could be exceedingly complicated, with outcomes

turning or possibly turning on esoteric actuarial concepts, or the interpretation and application of

ambiguously worded Treasury regulations.  It would certainly require expert witness testimony and perhaps trial.

In other words, despite the very considerable time and resources thus far devoted by both sides to assess, analyze and calculate liability and damages, further contested proceedings designed to present these questions for decision by the Court would be time-consuming, costly, and complicated.  A final resolution would likely take at least two years, and any judgment would likely be appealed, which depending on the results of the appeal, could result in the case being remanded to resume litigation. Even if at the conclusion of such proceedings liability is established, it is possible Plaintiffs will not have established that such losses exceeding the $45.9 million Settlement amount to which the Parties have agreed.  Settlement eliminates the risks of trial or further contested proceedings, and the inevitable delays and risks of pre-and post-trial processes.  *See Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 362 (S.D.N.Y. 2002) ("Delay, not just at the trial stage but through post- trial motions and the appellate process, would cause Class Members to wait years for any recovery, further reducing its value").  In sum, Plaintiffs submit the prospect of further lengthy, expensive, and complex litigation weighs heavily in favor of the proposed Settlement.

> **2.    The classes' reaction to the Settlement has been overwhelmingly favorable.**

The second factor for determining whether class action settlements should be approved is "the reaction of the class to the settlement."  *Grinnell*, 495 F.2d at 463.  As noted above, the deadline for filing objections has not passed but thus far the Settlement Classes' reaction has been very positive.  *See* Gyandoh Decl. ¶ 18; Gottesdiener Decl.¶ 8.  Assuming there are few or no objections, that fact would be indicative of a favorable Class reaction which in turn reflects favorably on the proposed settlement's reasonableness.  *See, e.g.*, *Wal-Mart Stores, Inc.*, 396

F.3d at 119 ("the favorable reaction of the overwhelming majority of class members to the Settlement is perhaps the most significant factor in our *Grinnell* inquiry"); *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 478 (S.D.N.Y. 1998) ("In litigation involving a large class, it would be 'extremely unusual' not to encounter objections"); *Stoetzner v. U.S. Steel Corp.*, 897 F.2d 115, 118-19 (3d Cir. 1990) (with 29 objections out of 281 member class the court concluded that the class "strongly favors settlement"); *Denney v. Jenkens & Gilchrist*, 230 F.R.D. 317, 337 (S.D.N.Y. 2005) (approving settlement with "a objection rate of less than 10%. Courts have frequently found this factor to be satisfied in the face of similar or higher levels of dissent").

### 3. Discovery has advanced far enough to assess the litigation's likely outcome.

The third factor identified by the Second Circuit for assessing the fairness and adequacy of class action settlements is "the stage of the proceedings and the amount of discovery completed." *Grinnell*, 495 F.2d at 463. This factor turns upon whether plaintiffs possess sufficient information regarding the merits of their claims to make an educated assessment regarding a litigation's likely outcome. Here, Class Counsel's (and Class Counsel's expert's) knowledge base was and is more than sufficient for Plaintiffs to have a well-informed view concerning the merits of the Settlement and likely outcome of this litigation. Plaintiffs have obtained considerable discovery from the Plan, including thousands of pages of data regarding Settlement Class members' retirement benefits and actuarial analyses of that data. Although additional discovery would be necessary if the case were to continue, it would not make an appreciable difference to either side's assessment of the strength or weakness of the Parties' claims and defenses. "[T]he Court's inquiry is into whether the plaintiffs have sufficient information to evaluate the adequacy of the proposed settlement, not whether they have availed

themselves of all possible information." *Taft v. Ackermans*, No. 02-cv-7951, 2007 WL 414493, at *6 (S.D.N.Y. Jan. 31, 2007); *see also In re American Bank Note Holographics, Inc.*, 127 F. Supp. 2d 418, 426 (S.D.N.Y. 2001) (counsel had a sufficient basis to assess the strengths and weaknesses of the plaintiffs' claims although they had taken no depositions and formal discovery was not complete).

Here, "the stage of the proceedings and the amount of discovery completed" support the approval of the settlement because substantial discovery in this matter was completed, both sides were in an excellent position to evaluate the strengths and weaknesses of their respective claims and defenses and to make a realistic appraisal of the value of the case. Moreover, in making these judgments, counsel for both Plaintiffs and Defendant were assisted by experts with specialized knowledge and experience in these matters.

### 4 & 5.  Plaintiffs face real risks in establishing liability and damages.

Perhaps the most important factors in any assessment of the merits of a proposed settlement are "the risks of establishing liability" and "the risks of establishing damages." *Grinnell*, 495 F.2d at 463.  "In weighing the risks of establishing liability and damages, the Court 'must only weigh the likelihood of success by the plaintiff class against the relief offered by the settlement.'"  *Asare v. Change Group of New York, Inc.*, No. 12-cv-3371, 2013 WL 6144764, at *11 (S.D.N.Y. Nov. 18, 2013) (quoting *In re Austrian & German Bank Holocaust Litig.*, 80 F. Supp. 2d 164, 177 (S.D.N.Y. 2000)).  Accordingly, in assessing the Settlement, the Court should balance the benefits afforded the Classes, including the immediacy and certainty of a recovery, against the continuing risks of litigation.  *See Grinnell*, 495 F.2d at 463.  Here, the law is unsettled on several issues relating to liability and/or damages on both of Plaintiffs' ERISA claims.  The Classes include persons who received allegedly backloaded accruals and/or lump

14

sums since the Plan's inception in 1989.  The Plan maintains that all but one of the Named Plaintiffs' claims are time-barred.  *See* Dkt. No. 25.  The Plan could prevail on its statute of limitations arguments and/or on the merits.  Even if Plaintiffs survived these attacks, the Plan could devise remedies the Court would endorse that would entirely wipe out or dramatically eliminate the benefits provided under the Settlement.

Thus, no matter how strongly Plaintiffs and Counsel believe in their case, there are clearly significant risks.   Under a variety of scenarios, the Court could rule for the Plan on liability, damages or some combination of both, leaving them with nothing or less than can be obtained through settling.  *See, e.g.*, *Adair v. Bristol Tech. Systems, Inc.*, No. 97-cv-5874, 1999 WL 1037878, at *2 (S.D.N.Y. Nov. 16, 1999) (approval of settlement was appropriate where plaintiffs' theory of liability "Defendants would have vigorously disputed with expert testimony"); *In re Sumitomo Copper Litig.*, 189 F.R.D. 274, 283 (S.D.N.Y. 1999) (risk of establishing damages that would require significant expert testimony weighed heavily in favor of approval of proposed settlement); *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 128-29 (S.D.N.Y. 1997), *aff'd*, 117 F.3d 721 (2d Cir. 1997) (difficulty of proving damages in class action involving novel issues and uncertain results supported approval of settlement).

**6.    Maintaining a class action through to final judgment is not certain.**

The sixth factor outlined by the Second Circuit for assessing the fairness of class action settlements is "the risks of maintaining the class action through the trial."  *Grinnell*, 495 F.2d at 463.  It too weighs in favor of the Settlement.  Absent the Settlement, the Plan would have fought class certification and may have sought to limit the scope of the classes in a manner that could have left many members of the Settlement Classes with nothing.  For instance, the Settlement provides for every participant in the Plan to receive some compensation – even those

who took their lump sums prior to February 12, 2001.  There was a risk that the Court could certify classes such that no one who took a lump sum prior to February 12, 2001 would be eligible for benefits.   Risk, expense, and delay permeate the class certification process. Settlement eliminates that risk, expense, and delay.  This factor thus favors final approval of the Settlement.

> **7.**      **The fact that the Plan could withstand a greater judgment is not dispositive.**

There is no evidence that the Plan would not be able to withstand a greater judgment. But "the fact that a defendant is able to pay more than it offers in settlement does not, standing alone, indicate that the settlement is unreasonable or inadequate."  *In re Global Crossing Sec. and ERISA Litig.*, 225 F.R.D. 465, 460 (S.D.N.Y. 2004) (internal quotation marks and citation omitted).  Otherwise, it would be impossible to justify any settlement against a defendant with very substantial assets.  *See D'Amato*, 236 F.3d at 86 (no abuse of discretion to approve settlement where, despite defendants' ability to withstand higher judgment, settlement was fair in light of other *Grinnell* factors).

> **8 & 9.   The Settlement is in the range of reasonableness in light of the best possible recovery and the attendant risks of litigation.**

The adequacy of the amount offered in settlement must be judged "not in comparison with the possible recovery in the best of all possible worlds, but rather in light of the strengths and weaknesses of plaintiffs' case."  *In re IMAX Securities Litig.*, 283 F.R.D. 178, 191 (S.D.N.Y. 2012) (citations and quotation omitted).  "The fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved."  *Grinnell*, 495 F.2d at 455.  Indeed, "there is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery."  *Id.* at 455 n.2.

a.      **The Lump Sum Class Settlement**

Under the Settlement, the Lump Sum Class will receive $30 million in benefits.  Under Plaintiffs' best-case scenario, the Lump Sum Class could recover as much as $260 million.  To obtain this result, however, a series of favorable decisions by this Court would have to be sustained on appeal under *de novo* review.  *See City of Pontiac Gen. Employees' Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169, 173 (2d Cir. 2011); *Wilkins v. Mason Tenders Dist. Council Pension Fund*, 445 F.3d 572, 581 (2d Cir. 2006).  First, every Settlement Class member, dating back to those who received lump sums in 1989, would have to defeat the Plan's several statute of limitations arguments, including the argument that Plaintiffs' claims accrued when they received their lump sum payments and expired six years later.  Second, Plaintiffs would have to prevail on all their liability theories.  Third, ultimately, the final reviewing court would have to adopt every measure of damages in the manner most favorable to Plaintiffs.

The vast majority of the potential $260 million in damages relate to lump sums paid more than six years before the first Named Plaintiff, Paul Caufield, filed suit on February 12, 2007.  Of the 3,529 Lump Sum Class members, 2,807 of them -- roughly 80% -- would recover nothing if the Plan prevailed on its leading statute of limitations argument; *i.e.*, that Plaintiffs' claims expired six years after they received their lump sums.  *See* Deutsch Decl. ¶ 5.  Of the potential $260 million that could theoretically be recovered, $250 million would go to those who received lump sums more than six years before the first Named Plaintiff filed suit, *see* Deutsch Decl. ¶ 6. *i.e.*, 96% of the potential recovery is vulnerable to Defendants' statute of limitations defense.  The ultimate Settlement reflects this very real vulnerability.  Thus, while 85% of the total Settlement amount is provided to individuals paid prior to February 12, 2007, this represents a settlement of only 10% the maximum potential settlement, compared to those paid after February

17

12, 2007 who are being paid 40% of the maximum potential settlement (still reflecting the potential that an ultimate ruling could be less favorable than the most favorable ruling based upon multiple factors, such as what the appropriate projection rate should be).

For Lump Sum Class members who received lump sums before February 12, 2001, the Settlement represents a gross recovery of approximately 10% of the maximum they could receive, including 5% prejudgment interest from the date of the original alleged underpayment to the assumed current payment date.  Because these Lump Sum Class members are exposed to a serious risk that they would be excluded from a class or have their claims dismissed outright, and thus recover nothing, receiving even 10% of their maximum possible recovery is a favorable result.

For Lump Sum Class members who received their payments after February 12, 2001, and who are thus not exposed to the Plan's argument that their claims became untimely six years after they received lump sums, the Settlement provides them with a gross recovery of approximately 41% of the maximum amount they could receive, including 5% prejudgment interest from the date of the original alleged underpayment to the assumed current payment date.

Despite the obviously greater magnitude of the Settlement Class's theoretical maximum recovery, Plaintiffs submit that the $30 million settlement fund here is a very favorable result in light of the risks of continued litigation.

### b.     The Backloading Class Settlement

The Backloading Class contends that the Plan's interest crediting rate, when combined with their pay credit rate, caused the Plan to fail ERISA's benefit accrual rules.   The approximately $15.9 million Backloading Class Settlement Fund represents nearly a 100% recovery of the additional benefits (including with interest at the Plan's interest crediting rate),

under Plaintiffs' theory, that the Backloading Class would have received had the Plan originally provided participants with higher pay credit rates. Unlike the lump sum claim, the likelihood of a final judgment providing benefits larger than the proposed settlement of the backloading claim is highly unlikely.

Plaintiffs had initially argued that use of a dynamic benefit formula -- one in which the pay credit schedule changed as the interest credit changed -- would not be allowable under applicable, controlling guidance. *See* Pls. Ltr. 3/13/09. However, it appears based upon evolving IRS guidance, that such a structure -- identical to the one used to determine the benefits due to the Backloading Class members under the proposed Settlement -- is one that the IRS would allow as a plan provision. *See, e.g.*, [Proposed] Accrual Rules for Defined Benefit Plans, 73 Fed. Reg. 34665, 2008 WL 2433424 (June 18, 2008); [Proposed] Additional Rules Regarding Hybrid Retirement Plans, 75 Fed Reg. 64197, 2010 WL 4065377 (Oct. 19, 2010) (suggesting that plan may be able to assume that the current interest crediting rate remained constant when determining compliance with IRC § 411(b)(1)(B), the parallel to ERISA § 204(b)(1)(B)).[5] It was thus appropriate for Plaintiffs to have assumed that they had a low chance of success prevailing on an argument that a resolution to the backloading violations would have to anticipate the possibility of lower interest credits in a future plan year, *i.e.*, that the ultimate ruling by the court would be more favorable than the Settlement agreed to regarding the backloading claim.

---

[5] Additionally, Plaintiffs recognized that Defendant would contend that it should be permitted to fashion the least expense remedy available. *See, e.g.*, *In re Citigroup Pension Plan ERISA Litig.*, 470 F. Supp. 2d 323, 399 (S.D.N.Y. 2006) ("The court declines to direct defendants to adopt plaintiffs' reformation proposals, but hereby orders defendants to reform the Plan consistent with the requirements of ERISA"), *rev'd on other grounds*, *Lonecke v. Citigroup Pension Plan*, 584 F.3d 457 (2d Cir. 2009); *DeVito v. Pension Plan of Local 819 IB.T Pension Fund*, 975 F. Supp. 258, 269 (S.D.N.Y. 1997) (declining invitation to reform the plan, instead directing defendant to do so "consistent with the requirements of ERISA").

**IV.    THE PROPOSED PLAN OF ALLOCATION IS FAIR, REASONABLE, AND ADEQUATE**

"'District courts enjoy broad supervisory powers over the administration of class-action settlements to allocate the proceeds among the claiming class members ... equitably.'"  *In re Currency Conversion Fee Antitrust Litig.*, 263 F.R.D. 110, 126 (S.D.N.Y. 2009) (quoting *In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 179, 181 (2d Cir. 1987) (internal quotation marks and citation omitted)).  "To warrant approval, the plan of allocation must meet the standards by which the ... settlement was scrutinized--namely, it must be fair and adequate."  *Maley*, 186 F. Supp. 2d at 367.

Here, a relative weighting of 100%-20%, meaning participants paid on or after February 12, 2001 (*i.e.*, six years before the date suit was filed), would be assumed to have a 100% chance of surviving a limitations challenge while participants prior to February 12, 2001 would be assumed to have a 20% chance of surviving a limitations challenge is clearly a reasonable assessment of the relative value of the respective Class members' claims.  In *Silberblatt v. Morgan Stanley*, 524 F. Supp. 2d 425 (S.D.N.Y. 2007), the court approved a comparable limitations-related allocation, noting that "[e]xactitude is not required in allocating consideration to the class, provided that the overall result is fair, reasonable and adequate."  *Id.* at 430.  The recommended plan of allocation meets the test of fairness, reasonableness and adequacy here. *See also Taft*, 2007 WL 414493, at *9 ("If the plan of allocation is formulated by "competent and experienced class counsel, an allocation plan need only have a 'reasonable, rational basis.'") (citation omitted); *Maley*, 186 F. Supp. 2d at 367 (plan of allocation should be approved as long as it has a "reasonable, rational basis").

## V.    THE REQUESTED ATTORNEYS' FEE AWARD IS REASONABLE AND FAIR

If the Court finally approves the Settlement, Class Counsel asks it to approve the request for attorneys' fees and reimbursement for expenses.  Specifically, Counsel seeks $11,475,000 million in attorneys' fees – 25% of the common fund.  This amount would compensate for total billable hours of 3,914.90.  *See* Gyandoh Decl. ¶ 20; Gottesdiener Decl. ¶ 3; Declaration of Douglas R. Sprong ("Sprong Decl.") ¶ 10; Declaration of Edgar Pauk ("Pauk Decl.") ¶ 13.[6] Class Counsel also seek reimbursement of Costs and expenses of $ 556,011.17, primarily for Plaintiffs' actuarial expert, and paying half of the private mediator's fee. Gyandoh Decl. ¶ 30; Gottesdiener Decl.¶ 6; Sprong Decl. ¶ 11; Pauk Decl. ¶ 15.[7]  Based on current billing rates, Class Counsel and Class Counsel's firms combined lodestar is $2,200,927.20.  *Id.*  An award of 25% of the fund, exclusive of expenses, would represent a multiplier of 5.2.

### A.    Governing Standards

In calculating a reasonable attorney's fee, this Court has discretion to choose between the lodestar method and the percentage of recovery method.  However, "[t]he trend in this Circuit is toward the percentage method, which directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation."

[6] This excludes the time devoted to the fee application and the motion for final approval and excludes the continued assistance to Class members in understanding the Settlement, returning claim forms, commenting on the proposed Settlement and the approval process, and the forthcoming fairness hearing.  It also excludes the future time that will be spent after final judgment is entered working with the enrolled actuary retained to provide the Plan with the final calculations needed to distribute the fund to Class members and rendering any other needed assistance to Class members or the Plan in connection with implementation of the final judgment. *Id.*

[7] This does not include another estimated $5,000 for the enrolled actuary to revise and finalize the calculations needed for final distributions, and an estimated $30,000 for the Notice Administrator fees for mailing notice and services for additional address searching, calls to the toll-free line until all distributions have been made, answering participant questions or directing them to Class Counsel or the Plan, updating the Settlement website as directed by Class Counsel and related matters.  *Id.*

*Wal-Mart Stores*, 396 F.3d at 121.  The lodestar method is disfavored because the "lodestar create[s] an unanticipated disincentive to early settlements, tempt[s] lawyers to run up their hours, and compel[s] district courts to engage in a gimlet-eyed review of line-item fee audits." *Id.* at 122 (internal quotations and citation omitted).  Under the percentage of recovery method, the Court considers the traditional six factors[8] and sets a percentage of the settlement as a fee "based on scrutiny of the unique circumstances of each case."  *Goldberger*, 209 F.3d at 47, 51-53.  Although the Second Circuit has rejected benchmarks, *see id.* at 51-53, 25% of the common fund falls within the standard range of awards.  *See, e.g.*, *Board of Trustees of the AFTRA Ret. Fund v. JPMorgan Chase Bank, et al.*, No. 09-cv-686, 2012 WL 2064907, at *2 (S.D.N.Y. June 7, 2012) (awarding $37.5 million, 25% of the common fund, because it was "well within the standard range for fee awards given under *Goldberger*.")

Under the lodestar method, the Court scrutinizes the fee petition to ascertain the number of hours reasonably billed to the plaintiff and multiplies that figure by an appropriate hourly rate and a multiplier, also determined by reference to the traditional factors.  *Id.*  Courts in this district have applied a wide range of multipliers.  *Compare Goldberger*, 209 F.3d 43 (affirming the district court's decision to apply no multiplier), *with Yuzary v. HSBC Bank USA, N.A.*, No. 12-cv-3603, 2013 WL 5492998, at *11 (S.D.N.Y. Oct. 2, 2013) (awarding a 7.6 multiplier).

Regardless of methodology, in determining a reasonable award of attorney's fees, the court seeks to balance the "overarching concern for moderation with the concern for avoiding disincentives to early settlements."  *In re Elan Sec. Litig.*, 385 F. Supp. 2d 363, 376 (S.D.N.Y. 2005) (citations and internal quotations omitted).

---

[8] The six *Goldberger* factors are:  (1) The time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations. *Goldberger*, 209 F.3d at 50.

**B.      The Requested Award Here is Fair, Reasonable and Justified**

**1.      The Time and Labor Expended By Counsel**

The first of the traditional factors in determining a reasonable common fund fee requires consideration of the time and labor expended by counsel.  *Goldberger*, 209 F.3d at 50.  This factor weighs in favor of granting Class Counsel's request because the firms have expended significant time and labor in prosecuting Plaintiffs' claims.

Class Counsel have expended considerable resources and time in the research, investigation, prosecution, and resolution of this Lawsuit.  Indeed, Class Counsel vigorously litigated this Lawsuit for more than three years, and thereafter, just as aggressively negotiated the Settlement terms for another three years.  Class Counsel thoroughly investigated the factual and legal basis for asserting the claims in the initial complaints; filed the Complaint; conducted targeted written discovery, including serving several third party subpoenas; worked intensively with outside actuarial experts in analyzing the data; sifted through hundreds of highly complicated Plan and Plan-related documents; and briefed the motion to dismiss. *See also supra* section III.C.3 (describing discovery efforts).  Further, in anticipation of the three separate mediation sessions that took place – on April 22, 2010, May 10, 2010, and May 20, 2010 – Class Counsel prepared several highly detailed, closely reasoned mediation statements supporting Plaintiffs' contentions and disputed issues of liability and damages.

Finally, the legal work in this Lawsuit is far from over, even if the Court were to grant final approval of the proposed Settlement.  Class Counsel will continue to incur additional time and expend resources in overseeing the administration of the Settlement and in responding to inquiries and issues from members of the Settlement Classes.  *See, e.g.*, *Johnson v. Brennan*, No. 10-cv-4712, 2011 WL 4357376, at *16 (S.D.N.Y. Sept. 16, 2011) (recognizing that "the

requested fees are not based solely on time and effort already expended; they are also meant to compensate Class Counsel for time that will be spent administering the settlement in the future").

All of these efforts were undertaken despite the risk that Plaintiffs would not prevail in this Lawsuit, and that Counsel and their firms would therefore receive nothing for their efforts. The "time and labor expended by counsel" in producing an excellent settlement therefore support fee requested.  *See, e.g.*, *In re Sumitomo Copper Litig.*, 74 F. Supp. 2d 393, 399 (S.D.N.Y. 1999) (27.5% fee award was justified where counsel "were required to expend substantial amounts of professional time and money away from other professional business in order to prosecute the action, with no certainty of recovery thereof from any source").

### 2.  The Magnitude and Complexity of the Litigation

The second Goldberger factor requires the Court to consider the complexities and magnitude of the litigation.  *Goldberger*, 209 F.3d at 50.  The scope and complexity of this case also weigh in favor of the Court approving the requested award.

Any attorney who intends to successfully prosecute any class-wide, statutorily-based claim for pension benefits – cash balance or otherwise – must obtain a command of significant portions of ERISA, the Internal Revenue Code, regulations and regulatory guidance issued by the Department of the Treasury, the IRS and the Department of Labor and their interrelationships.  Mastery of these relevant materials and principles is a never-ending process because, nearly every year, Congress amends the statutes governing pension plans, and the agencies charged with enforcing the pension statutes issue interpretive guidance even more often.  Even for counsel experienced in these matters, cash balance litigation is uniquely complicated.  A judge in the District of Connecticut summed up the unusual complexity of cash balance litigation as part of his 122-page cash balance decision in *Amara v. Cigna Corp.*, 534 F.

Supp. 2d 288 (D. Conn. 2008), by observing: "ERISA, and the regulations under it, are often lamentably obscure – to describe them as a tangled web does not do them justice." *Id.* at 296; *see also In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 456, 459 n.13 (S.D.N.Y. 2004) (describing ERISA jurisprudence as "a rapidly developing, and somewhat esoteric, area of law.")

This Lawsuit is no exception. It hinges on numerous complex legal and factual issues under ERISA which require comprehensive evidentiary support and testimony. *See supra* section III.C.1. The magnitude and complexity of this Lawsuit has been borne out by the time and effort Class Counsel put into litigating the case for over three years and negotiating the terms of the proposed Settlement for an additional three years, which is outlined herein.

These facts all support the reasonableness of the requested fee.

### 3.     The Risks of the Litigation

The risk of the litigation is "perhaps the foremost factor to be considered in determining whether to award an enhancement." *Goldberger*, 209 F.2d at 54 (internal citations and quotations omitted). The risk undertaken by Class Counsel is measured by, among other things, the presence of government action preceding the suit, the ease of proving claims and damages, and, if the case resulted in settlement, the relative speed at which the case was settled. *See In re Merrill Lynch Tyco Research Sec. Litig.*, 249 F.R.D. 124, 139-40 (S.D.N.Y. 2008).

Nothing in this case was easy. Class Counsel did not "piggy back" on any prior governmental action related to the Plan. *Maley*, 186 F. Supp. 2d at 371; *Karpus v. Borelli (In re Interpublic Secs. Litig.)*, No. 03-cv-1194, 2004 WL 2397190, at *12 (S.D.N.Y. Oct. 26, 2004) ("This was not a case in which there was a government investigation that had resulted in disclosure of misconduct and was also driving a settlement"). Settlement talks were contentious

and proceeded fitfully over the course of a year, with no assurance there would ever be a meeting of the minds.  Even then, it took three additional years of contentious negotiation (and sometimes active litigation) to reach agreement as to what was agreed in principle years earlier and what the proper scope of that agreement was.  Closure was only obtained because Class Counsel was aggressively pushing to get the case back onto a full litigation track and was willing to risk the (undocumented) gains obtained in the 2010 mediation if Defendants did not accede to Plaintiffs' requirement that there be a complete carve-out of the residual annuity claims.  *See supra* Section III.C.4 & 5 (discussing the risks of establishing liability and damages).

These risks were clear to Class Counsel from the outset.  The novelty of many of these issues, as to both liability and damages, made this case an extremely risky one.  *See, e.g.*, *In re Giant Interactive Group, Inc. Sec. Litig.*, 279 F.R.D. 151, 162 (S.D.N.Y. 2011) ("The determination, like the determination of liability, is a complicated and uncertain process, typically involving expert opinions.").  Being able to present such a favorable Settlement to the Settlement Classes despite those risks tends to support an award of fees in the amount requested.

An ERISA cash balance case like this is not easily compared to the relatively low-risk securities cases discussed in *Goldberger*.  There are only a handful of ERISA lawyers around the country prosecuting actions like the instant case as most large class-action firms and ERISA lawyers shun them because they lack the requisite expertise.  This lack of enthusiasm contrasts sharply with the interest in securities-related cases, even under ERISA.  *See In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, No. 02-cv-5575, 2006 WL 2789862 (S.D.N.Y. Sept. 28, 2006) (18 law firms sought lead counsel role, 24 law firms appeared for plaintiffs).

That Class Counsel took those risks is deserving of recognition in the fee awarded.

### 4.      The Quality of the Representation

The fourth factor is the "quality of representation" delivered in the litigation. *Goldberger*, 209 F.3d at 50.  The quality of representation is best measured by results achieved.  *Id.*

Clearly, the Settlement represents a recovery to the Settlement Classes which is in the upper range of reasonableness in a case of such complexity, magnitude and risk.  Given the obstacles that remained before the Settlement Classes could secure any recovery let alone one of the magnitude Class Counsel's efforts generated, the $45.9 million outcome here reflects a high quality of work.

In addition, also due to Class Counsel's efforts, Settlement Class members will have the opportunity of receiving their additional benefit on the same tax-favored basis as their original distribution.  Further, under the Agreement Class Counsel negotiated on behalf of the Settlement Classes, the Classes bear only the very modest cost of Class Notice.  The Plan will shoulder the responsibility to act, effectively, as escrow agent and settlement administrator, processing election forms, rollover versus direct disbursement requests, and making many thousands of individual payments to the Settlement Classes.  The savings to the Settlement Classes as a result of not having to foot the bill for these services is obviously substantial, and a further benefit worthy of recognition Class Counsel has bestowed upon the Settlement Classes.  *Spann v. AOL Time Warner, Inc.*, No. 02-cv-8238, 2005 WL 1330937, at *3 & n.3 (S.D.N.Y. June 7, 2005) (noting that class was required to pay out of the settlement fund "post-approval [settlement] administration fees of $300,000;" only if costs exceeded that amount would they be paid by the defense).

The nature of the opposition faced by counsel also should be considered in assessing the quality of Class Counsel's performance in determining an award of fees.  *In re Merrill Lynch*

*Tyco*, 249 F.R.D. at 141.  Here, the caliber of opposing counsel, Morgan, Lewis & Bockius LLP, was clearly of the highest order and required that whoever represented Plaintiffs and the Settlement Classes be capable of providing comparable services.  *See, e.g.*, *Carlson v. Xerox Corp.*, 596 F. Supp. 2d 400, 412 (D. Conn. 2009) (approving fee request where "the Class received high legal representation and obtained a very large settlement in the face of vigorous opposition by highly experienced and skilled defense counsel")

The reaction of Settlement Class members, which has thus far been uniformly positive toward the settlement, also supports the requested fee.  *See, e.g.*, *In re Prudential Sec. Inc. Ltd. P'ships. Litig.*, 985 F. Supp. 410, 416 (S.D.N.Y. 1997) ("In determining the reasonableness of a requested fee, numerous courts have recognized that 'the lack of objection from members of the class is one of the most important reasons'") (citation omitted); *Maley*, 186 F. Supp. 2d at 374 ("The reaction by members of the Class is entitled to great weight by the Court.").  Clearly, this factor needs to be re-evaluated after the deadline for objections has run, but the lack of objections to Class Counsel's fee application to date suggests the requested fee is fair.  Indeed, the  Class Notice mailed to Settlement Class members informed the Classes of the proposed Settlement and the exact amount of attorneys' fee Class Counsel would seek as well as a court-ordered procedure by which an individual Settlement Class member could object to the fee requested by Class Counsel.

Without the experience, skill, and determination displayed by Class Counsel during the prosecution of this Lawsuit, as well as the hard-fought settlement negotiations with Defendant that occurred over the course of three years, such a favorable recovery for the Settlement Classes would not have been attained.  The ability of Class Counsel to obtain a substantial recovery for

the Settlement Classes in the face of such formidable legal opposition reflects the superior quality of work and strongly favors the requested attorneys' fees.

### 5. The Award Requested in Relation to the Settlement Amount

The fifth factor for determining the appropriate percentage fee award in class actions is the "requested fee in relation to the settlement," *i.e.*, whether the requested fee represents a fair percentage of the settlement achieved. *Goldberger*, 209 F.3d at 50 (citation omitted). This factor also supports the requested award.

The requested amount of attorneys' fees, representing 25% of the total recovery to the Class of $45.9 million, is well within the range of fees commonly awarded in other class action settlements in this Circuit and would not constitute a windfall. *See, e.g.*, *Yuzary*, 2013 WL 5492998, at *9-10 (awarding attorney's fee of 31.7% of settlement fund); *In re Bear Stearns Cos. ERISA Litig.*, MDL No. 08-1963, Order and Final Judgment, at ¶ 8 (S.D.N.Y. Sept. 20, 2012) (awarding attorneys' fees in amount of 30% on the $10 million settlement); *Board of Trustees of the AFTRA Ret. Fund*, 2012 WL 2064907, at *3 (awarding 25% of the $150 million settlement amount); *Taft*, 2007 WL 414493, at *10 (awarding 30% of $15.17 million settlement; "[t]hirty percent of a larger settlement fund could constitute a windfall; however, a settlement fund of this size does not create such an issue"); *Hicks v. Morgan Stanley*, No. 01-cv-10071, 2005 WL 2757792, at *9 (S.D.N.Y. Oct. 24, 2005) (30% of $10 million settlement; "[a] settlement amount of $10 million does not raise the windfall issue in the same way as would a $100 million settlement, and a 30% fee does not produce such a windfall"); *In re Globalstar Sec. Litig.*, No. 01-cv-1748 (S.D.N.Y. Dec. 9, 2005) (25% of $20 million); *see also In re AMF Bowling Sec. Litig.*, 334 F. Supp. 2d 462, 470 (S.D.N.Y. 2004) (awarding fees of 25% of $5 million fund); *Sines v. Service Corp. Intern.*, No. 03-cv-5465, 2006 WL 1148725, at *1-4

(S.D.N.Y. May 1, 2006) (awarding 20% of $4.45 million fund); *In re: Vitamins Antitrust Litig.*, No. MISC. 99-197, MDL 1285, 2001 WL 34312839, at *11 (D.D.C. July 16, 2001) (awarding 34% of common fund, noting "counsel achieved this Settlement expeditiously. While there was no lengthy litigation, counsel should not be penalized for achieving an effective and efficient settlement").

Class Counsel's request is also within the range of numerous fee awards in other recent ERISA class action cases in this Circuit and elsewhere. *See, e.g.*, *Becher v. Long Island Lighting Co.*, 64 F. Supp. 2d 174 (E.D.N.Y. 1999) (awarding 33.3%, of $7.75 million fund); *Beam v. HSBC Bank*, No. 02-cv-00682, Dkt. 124 (W.D.N.Y. Nov. 21, 2005) (awarding 25% of $9.35 million fund); *Spann*, *supra* (awarding 33.3% of $2.9 million fund).[9]

### 6.   Public Policy Considerations

The Second Circuit has also noted that "public policy considerations" should be considered in determining the fee awarded to plaintiffs' counsel in class actions. *Goldberger*, 209 F.3d at 50.  Obviously, protecting workers' retirement funds is of genuine public interest. Private enforcement of the pension laws, as is the nature of the Lawsuit here, is a necessary adjunct to government intervention because the Department of Labor lacks the resources to

---

[9] *See also Mehling v. New York Life Ins. Co.*, 248 F.R.D. 455, 466 (E.D. Pa. 2008) (30% of $14 million fund; noting that 33.3% and 35% awards approved for funds of similar size); *Berger v. Xerox Corp. Ret. Income Guar. Plan*, No. 00-cv-584, 2004 WL 287902, at *2 (S.D. Ill. Jan. 22, 2004) (29% fee "is at or below the market rate for this and similar litigation"); *In re CMS Energy ERISA Litig.*, No. 02-cv-72834, 2006 WL 2109499, at *3 (E.D. Mich. June 27, 2006) (28.5% of $28 million fund, plus interest); *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043 (9th Cir. 2002) (28% of $97 million fund); *In re Xcel Energy, Inc., Sec., Derivative & "ERISA" Litig.*, 364 F. Supp. 2d 980 (D. Minn. 2005) (25% of common fund ERISA case); *Millsap v. McDonnell Douglas Corp.*, No. 94-cv-633, 2003 WL 21277124, at *15 (N.D. Okla. May 28, 2003) (25% of $36 million ERISA case); *In re Providian Fin. Corp.*, No. C-02-1001, 2003 WL 22005019, at *2 (N.D. Cal. June 30, 2003) (25% of common fund in ERISA case); *Vaszlavik v. Storage Tech. Corp.*, No. 95-B-2525, 2000 U.S. Dist. Lexis 21140, at *12 (D. Colo. Mar. 9, 2000) (30% of common fund in ERISA case).

police even a small fraction of the distributions made by plans across the country. That is why it is critical that remuneration in successful enforcement actions like this one is both fair and rewarding – to make certain that injured parties are represented by counsel capable of effectively fighting for their rights. *See, e.g.*, *In re AMF Bowling Sec. Litig.*, 334 F. Supp. 2d at 468 (recognizing "the need to encourage [counsel for] plaintiffs to undertake worthy cases that vindicate the rights of injured [parties]"); *Sines*, 2006 WL 1148725, at *1 (counsel [should] receive full and fair compensation for their work lest an inadequate award serve as a disincentive to filing meritorious suits in the future"). A fee award commensurate with the risks run and the results achieved in successful cases like this one will help ensure that attorneys are willing to represent employees in these cases, thereby promoting private enforcement of, and compliance with, ERISA. *See, e.g.*, *In re Visa Check/Mastermoney Antitrust Litig.*, 297 F. Supp. 2d 503, 524 (S.D.N.Y. 2003) ("The fees awarded must be reasonable, but they must also serve as an inducement for lawyers to make similar efforts in the future").

### 7.    Lodestar Cross-Check Confirms the Reasonableness of the Requested Fee

"Following *Goldberger*, the trend in the Second Circuit has been to apply the percentage method and loosely use the lodestar method as a 'baseline' or 'cross check.'" *Johnson v. Brennan*, No. 10-cv-4712, 2011 WL 4357376, at *20 (S.D.N.Y. Sept. 16, 2011) (citing *Goldberger*, 209 F.3d at 50).[10] *See also Board of Trustees of the AFTRA Ret. Fund v. JPMorgan Chase Bank, et al.*, No. 09-cv-686, 2012 WL 2064907, at *1 (S.D.N.Y. June 7, 2012) (noting "the lodestar is often used as a cross-check"). Where the lodestar is "used as a mere cross-check, the hours documented by counsel need not be exhaustively scrutinized by the district court." *Id.*

---

[10]  While the Second Circuit encourages the use of the lodestar method as a "cross-check," it has acknowledged that the lodestar method utilized on its own may "prove[] vexing" and result in "an inevitable waste of judicial resources." *Goldberger*, 209 F.3d at 48-50.

### a.      The number of hours are reasonable

The starting point of a lodestar analysis is determining counsel's lodestar by "multipl[ying] hours reasonably expended against a reasonable hourly rate." *Wal-Mart*, 396 F.3d at 121. As noted above, the total number of hours billed by Class Counsel is 3,914.90.  Plaintiffs submit the amount of time Class Counsel have expended is appropriate and reasonable in the light of scope and complexity of this case as discussed herein.

### b.      Counsel's billing rates are reasonable

The second step in the lodestar cross-check analysis is to evaluate the reasonableness of the current billing rates charged by counsel.  The Second Circuit in *Goldberger* noted that the overall goal of the fee-setting process is to replicate the rate that counsel would be paid in a perfect market.  209 F.3d at 52 ("market rates, where available, are the ideal proxy for their compensation").  The use of current rates to calculate the lodestar figure has been repeatedly endorsed by courts as a means of accounting for the delay in payment inherent in class actions and for inflation.  *See, e.g.*, *Missouri v. Jenkins*, 491 U.S. 274, 283-84 (1989); *LeBlanc-Sternberg v. Fletcher*, 143 F.3d 748, 764 (2d Cir. 1998).

The governing standard is the prevailing rate for the relevant type of legal work in the community where the services were performed.  *See, e.g.*, *Luciano v. Olsten Corp.*, 109 F.3d 111, 115-16 (2d Cir. 1997).  Perhaps the best indicators of the "market rates" in New York for class counsel in class actions are the rates charged by New York firms that defend class actions on a regular basis.  Those rates run as high as $800 per hour or more for comparable experience.

The rates charged by Class Counsel and their firms' staff here ($200-$735) are thus well in line and appropriate for New York.[11]

Thus, a market check and substantial precedent demonstrate that Class Counsel rates are entirely reasonable.

### c.      The multiplier implied is also reasonable

Courts have continually recognized that, in instances where a lodestar analysis is employed to calculate attorney's fees or used as a "cross-check" for a percentage of recovery analysis, counsel may be entitled to a "multiplier" of their lodestar rate to compensate them for the risk assumed by them, the quality of their work, and the result achieved for the class. *See, e.g.*, *Goldberger*, 209 F.3d at 54.  As noted above, Class Counsel have collectively spent over 3,914 hours in connection with this Lawsuit, resulting in a total lodestar of $ 2,200,927.20.  The requested attorneys' fees thus represent a multiplier of 5.2.

As the Second Circuit has emphasized, courts should assess the reasonableness of lodestar multipliers by considering the same factors analyzed to compute a suitable percentage fee.  *See Wal-Mart*, 396 F.3d at 121.  The analysis set forth above demonstrates that Class Counsel have produced an excellent result for the Settlement Class in a difficult and challenging

---

[11] *See, e.g.*, *In re Independent Energy Holdings PLC*, No. 00-cv-6689, 2003 WL 22244676, at *9 (S.D.N.Y. Sept. 29, 2003) (approving rates of $650/hour for a partner, and $300-$425/hour for associates); *In re Stock Exchanges Options Trading Antitrust Litig.*, No. 99-cv-0962, 2006 WL 3498590, at *10 (S.D.N.Y. Dec. 4, 2006) (finding blended average rate of $424 per hour reasonable); *Bianco v. Erkins*, 284 B.R. 349, 352 (S.D.N.Y. 2002) (finding, in 2002, that rates of $535 to $595 per hour for partners were reasonable); *In re Bankamerica Corp. Secs. Litig.*, 228 F. Supp. 2d 1061, 1065 (E.D. Mo. 2002) ($695 "within the range of reasonableness in the realm of nationwide securities class actions").

case.  In cases presenting similar risk profiles, courts in this Circuit have repeatedly awarded class counsel multipliers that equaled or exceeded the multiplier requested here.[12]

A significant multiplier is appropriate in an action settled at this stage of the proceedings in order to encourage the efficient resolution of cases and economical use of judicial resources. *See, e.g.*, *In re Visa Check/Mastermoney Antitrust Litig.*, 297 F. Supp. 2d at 525 ("Were the case not so fully litigated, settling only on the eve of opening statements, a larger multiplier [than 3.5] might well be necessary to properly reward Class Counsel and encourage counsel to bring similar cases in the future"); *Maley*, 186 F. Supp. 2d at 368 (awarding 33% in common fund securities case settled early in litigation); *In re APAC Teleservices, Inc. Sec. Litig.*, No. 97-cv-9145, 1999 U.S. Dist. Lexis 17908, at *2 (S.D.N.Y. Dec. 10, 2001) (awarding 33% of a $21 million settlement prior to start of depositions); *In re Safety Components Int'l Inc. Sec. Litig.*, 166 F. Supp. 2d 72 (D.N.J. 2001) (awarding 33% of settlement fund when case settled early in litigation).

---

[12] *See, e.g.*, *Yuzary*, 2013 WL 5492998 at *11 (finding 7.6 multiplier to "fall[] within the range granted by courts."); *Wal-Mart*, 396 F.3d at 123 ("Here, the lodestar yields a multiplier of 3.5, which has been deemed reasonable under analogous circumstances."); *In re Lloyd's Am. Trust Fund Litig.*, No. 96-cv-1262, 2002 WL 31663577, at *27 (S.D.N.Y. Nov. 26, 2002) (citing fee awards of up to 12 times lodestar); *Maley*, 186 F. Supp. 2d at 369, 371 (citing multipliers in S.D.N.Y. up to 7.7; awarding multiplier of 4.65); *In re EVCI Sec. Litig.*, 2007 WL 2230177, at *17 & n.6 (S.D.N.Y. July 27, 2007) (noting that "multipliers of nearly 5 have been deemed 'common' by courts in this District" and collecting cases with multipliers of up to 6.96); *Maley*, 186 F. Supp. 2d at 368-69 (33 1/3% fee producing a multiplier of 4.65 was "well within the range awarded by courts in this Circuit and throughout the country"); *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 489 (S.D.N.Y. 1998) (Judge Sweet approving fee representing a multiplier of 3.97, and noting that lodestar multiples of between 3 and 4.5 are common); *In re Sumitomo Copper Litig.*, 74 F. Supp. 2d at 399 (awarding a 27.5% fee and finding multipliers of 3 to 4.5 to be common); *Roberts v. Texaco, Inc.*, 979 F. Supp. 185, 197 (S.D.N.Y. 1997) (in which Judge Brieant approved a 5.5 multiplier); *In re RJR Nabisco Inc. Sec. Litig.*, No. 88-cv-7905, 1992 WL 210138, at *5 (S.D.N.Y. Aug, 24, 1992) (multiplier of 6); *Cosgrove v. Sullivan*, 759 F. Supp. 166, 167 n.1 (S.D.N.Y. 1991) (8.74 multiplier).

Recent decisions have recurrently emphasized that the lodestar cross check should not override the percentage approach. In *In re Buspirone Antitrust Litig.*, No. 01-MD-1410, at 42-43 (S.D.N.Y. April 11, 2003), Judge Koetl awarded a 33 1/3% fee with an 8.46 multiplier, justifying it in part by the fact that the case settled with substantial work remaining if the litigation went forward; thus, if settlement were delayed "the Lodestar would have gone up and the multiplier would have gone down." *Id.*, *cited in In re Visa Check/Mastermoney Antitrust Litig.*, 297 F. Supp. 2d at 523 n.29.

Earlier, in *Newman v. Carabiner Int'l Inc*, No. 99-cv-2271 (S.D.N.Y. October 19, 2001), where a 7.7 multiplier was approved, Judge Lynch expressly commented:

> I wanted to note that, in my view, there is no difficulty with the fact candidly acknowledged in the paper that, in terms of the time expended, this a profitable case for the plaintiffs' lawyers who worked on it. Contingency type percentage settlements serve an important purpose.... so it is important in awarding fees or approving a fee settlement in a case of this kind not to be... blinded or distorted that in this particular case, calculated on an hourly basis, this is a very large, high proportion to what the hourly charges would have been.

*Id.* at 6.

Similarly, this Court has said:

> The lawyer who succeeds in having the enemy wave the white flag of surrender without firing his or her weapon should be handsomely rewarded.  Indeed, one may posit that, in a common fund case utilizing the percentage method, the multiplier would likely be larger in a case where fewer hours were needed to bring the opposing side to a satisfactory settlement.

*Sines*, 2006 WL 1148725, at *3.

Thus, the "cross check" lodestar analysis contemplated by the Second Circuit fully supports the reasonableness of the fee requested.

## VI.    THE COURT SHOULD REIMBURSE CLASS COUNSEL FOR EXPENSES INCURRED IN CONNECTION WITH THIS LITIGATION

"It is well established that counsel who create a common fund are entitled to the reimbursement of expenses that they advance to a class."   *In re Veeco Instruments Inc. Sec. Litig.*, No. 05-md-1695, 2007 WL 4115808, at *10 (S.D.N.Y. Nov. 7, 2007).  *See also In re Marsh ERISA Litig.*, 265 F.R.D. 128, 150 (S.D.N.Y. 2010) (it is "well-established that counsel who create a common fund ... are entitled to the reimbursement of [all reasonable] litigation costs and expenses"); *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 246 F.R.D. 156, 178 (S.D.N.Y. 2007) ("Counsel is entitled to reimbursement from the common fund for reasonable litigation expenses."); FED. R. CIV. P. 23(h).  The Court may award reimbursement of reasonable out-of-pocket expenses incurred by counsel and customarily charged to their clients, as long as these were "incidental and necessary to the representation."  *Reichman v. Bonsignore, Brignati & Mazzotta, P.C.*, 818 F.2d 278, 283 (2d Cir. 1987).  *See also In re Marsh ERISA Litig.*, 265 F.R.D. at 150 ("The expenses that may be reimbursed from the common fund encompass all reasonable litigation-related expenses.").

Class Counsel respectfully request reimbursement of $556,011.17 in expenses, which were advanced or incurred collectively while prosecuting the Lawsuit.  The expenses were all reasonable, necessary, and directly related to the prosecution of the Lawsuit, and include standard litigation costs and expenses such as costs for experts, travel, deposition and court transcripts, court reporters, copying, postage, and other costs incurred during the three year litigation history in this Action.  These expenses were critical to Class Counsel's success in achieving the proposed Settlement.

Courts routinely deem such expenses as reasonable and worthy of reimbursement.  *See, e.g.*, *Board of Trustees of the AFTRA Ret. Fund*, 2012 WL 2064907, at *1 (approving request for

reimbursement of costs which "include[d] routine expenses related to copying, court fees, postage and shipping, phone charges, legal research, and travel and transportation"); *In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 468 (S.D.N.Y. 2004) ("The expenses incurred – which include investigative and expert witnesses, filing fees, service of process, travel, legal research and document production and review – are the type for which the paying, arms' length market reimburses attorneys [and] for this reason, they are properly chargeable to the Settlement fund.").

As discussed herein, the proposed Settlement is the product of arms-length negotiations that spanned more than three years in litigation, followed by another three years of settlement negotiations. The expenses Class Counsel have incurred during this time are of the type routinely reimbursed by courts. *See, e.g.*, *In re Currency Conversion Fee Antitrust Litig.*, No. 04-cv-5723, 2012 WL 3878825, at *2 (S.D.N.Y. Aug. 22, 2012) ("Given the magnitude of this case, its national scope, long duration, and the extensive expert discovery conducted by the parties, this Court is satisfied that the expenses incurred were reasonable."). Further, to date, no objections have been received regarding Class Counsel's request for reimbursement of expenses as set forth in the Class Notice mailed to members of the Settlement Classes more than fifty days ago.[13] Accordingly, Class Counsel respectfully request that the Court grant the request for reimbursement of expenses in full.

## VII.   THE REQUESTED NAMED PLAINTIFF CASE CONTRIBUTION AWARDS ARE FAIR AND REASONABLE

The excellent result obtained in this Lawsuit could not have been achieved without the substantial and continuing efforts of the Named Plaintiffs. From the time the initial complaints

---

[13]   As noted *supra*, the settlement objection deadline has not yet elapsed. To the extent there are any objections to Class Counsel's request for reimbursement of expenses, or any other aspect of the Settlement, Class Counsel will respond thereto on or before March 21, 2014.

were filed through the Settlement, the Named Plaintiffs were kept abreast of the details of the litigation and offered their insight and opinions.   An incentive award may be given to compensate named plaintiffs for efforts expended "for the benefit of the lawsuit." *Dornberger v. Metropolitan Life Ins. Co.*, 203 F.R.D. 118, 125 (S.D.N.Y. 2001) (citation omitted).   In this Circuit, "the Courts have, with some frequency, held that a successful Class action plaintiff, may, in addition to his or her allocable share of the ultimate recovery, apply for and, in the discretion of the Court, receive an additional award, termed an incentive award." *Bellifemine v. Sanofi-Avents, U.S., LLC*, No. 07-cv-2207, 2010 WL 3119374, at *7 (S.D.N.Y. Aug. 6, 2010).

All six Plaintiffs actively and effectively fulfilled his/her obligations as a representative of the Settlement Classes, complying with all reasonable demands placed upon them during the prosecution and settlement of this Lawsuit and providing invaluable assistance to Class Counsel. In devoting substantial effort and time to this Lawsuit on behalf of the Settlement Classes, Named Plaintiffs reviewed draft pleadings and motions, searched for and produced relevant documents, reviewed filings, communicated regularly with Class Counsel, and were continuously involved with the litigation process.

Here, Plaintiffs request an incentive award in the amount of $5,000 each to compensate them for their efforts and personal time spent advancing the litigation on behalf of the Class. The requested amount is in line with awards in similar complex class actions awarded in this Circuit and around the country.  *See, e.g.*, *Board of Trustees of AFTRA Retirement Fund*, 2012 WL 2064907, at *3 (awarding $50,000 to class representatives); *In re Marsh ERISA Litig.*, 265 F.R.D. at 151 (awarding case contribution awards in the amount of $15,000 to each of the three Named Plaintiffs); *Strougo v. Bassini*, 258 F.Supp.2d 254, 264 (S.D.N.Y. 2003) (granting award of $15,000 to class representative).  *See also Alford v. United Community Banks, Inc.*, No. 11-cv-

309, slip op. at 7 (N.D. Ga. Jan. 9, 2014) (order approving $5,000 case contribution award for named plaintiff, finding this award was "in line with service awards for named plaintiffs in similar cases."); *In re R.H. Donnelley Corp. ERISA Litig.*, No. 09-cv-7571, slip op. at 2 (N.D. Ill. Nov. 14, 2012) (approving $5,000 case contribution awards to the two named plaintiffs "in recognition of their contributions" to the action.).

The request Plaintiffs make is a modest one and other Settlement Class members, notified through the Class Notice that Plaintiffs would be making it, have not objected further confirming the adequacy of the request.

## CONCLUSION

Based on the foregoing, Plaintiffs respectfully request the Court approve the Settlement and Lump Sum Plan of Allocation, certify the Settlement Classes, and award attorneys' fees in the amount of $11,475,000.00, approve the reimbursement of expenses in the amount of $556,011.17, and approve Case Contribution Awards in the amount of $5,000 to each of the Named Plaintiffs.

Dated:  March 11, 2014                    Respectfully submitted,

                                          /s/ Mark K. Gyandoh_____
                                          KESSLER TOPAZ MELTZER & CHECK, LLP
                                          Edward W. Ciolko (admitted pro hac vice)
                                          eciolko@ktmc.com
                                          Mark K. Gyandoh (admitted pro hac vice)
                                          mgyandoh@ktmc.com
                                          280 King of Prussia Road
                                          Radnor, Pennsylvania 19087
                                          Telephone: (610) 667-7706
                                          Facsimile: (610) 667-7056

                                          KOREIN TILLERY LLC
                                          Douglas R. Sprong (admitted pro hac vice)
                                          dsprong@koreintillery.com
                                          505 N. Seventh St., Suite 3600
                                          St. Louis, MO 63101
                                          Telephone: (314) 241-4844
                                          Facsimile: (314) 588-7036

39

LAW OFFICE OF EDGAR PAUK
Edgar Pauk
lawoffice@edgarpauk.com
1066 Union Street
Brooklyn, NY 11225
Telephone: (718) 399-2023

GOTTESDIENER LAW FIRM, PLLC
Eli Gottesdiener [EG 0111]
eli@gottesdienerlaw.com
498 7th Street
Brooklyn, New York 11215
Telephone: (718) 788-1500
Facsimile: (718) 788-1650

*Counsel for Plaintiffs and the Proposed Classes*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 11th day of March, 2014, I caused a true and correct copy of

the foregoing document to be filed and served via the Court's Electronic Filing System.

*s/ Mark K. Gyandoh*
Mark K. Gyandoh

41